SCOTT MANSFIELD,

     Petitioner,

-vs-
                             **Case No. 6:05-cv-1466-Orl-31KRS**

SECRETARY, DEPARTMENT OF
CORRECTIONS, et al.,

     Respondents.

## MEMORANDUM OPINION AND ORDER

### I.    PREFACE

At approximately 3:00 a.m. on October 15, 1995, Sara Robles was brutally murdered in a vacant lot adjacent to a Winn-Dixie store in Kissimmee, Florida. Her body was discovered that morning, and the Kissimmee Police Department began an investigation. A pager was found at the scene and traced to Petitioner, Scott Mansfield. It was also determined that Mansfield and another man, William Finneran, were the last people to be seen with the victim before her death.

About 9:30 p.m. that same day, several detectives from the Kissimmee Police Department went to Mansfield's house and took him to the Kissimmee police station where he was interrogated over the course of two and one-half hours without any *Miranda* warnings. Shortly after midnight, he was arrested and charged with the murder of Sara Robles.

Mansfield's jury trial was held two years later. Over Mansfield's objection, the trial judge permitted the State to play a two-and-one-half-hour video of Mansfield's interrogation to the jury.

On November 10, 1997, after approximately five and one-half hours of deliberation, the jury

returned its verdict: guilty of murder in the first degree. Following the penalty phase, the jury

returned a 12-0 recommendation for imposition of the death penalty. The trial court sentenced

Mansfield to death on January 30, 1998.

Having exhausted his direct appeals and State collateral review over the past ten years,

Petitioner now seeks a federal writ of habeas corpus. The Court has jurisdiction pursuant to 28

U.S.C. § 2241.

## I.      STATEMENT OF THE FACTS

The facts, as set forth by the Florida Supreme Court, are as follows:

> On the morning of October 15, 1995, the body of Sara Robles was found
> lying in a grassy area next to a Winn-Dixie grocery store in Kissimmee, Florida.
> Robles was lying on her back with her legs and arms outstretched. Her shirt and
> skirt were pushed up partially revealing her breasts and pelvic area which were
> mutilated.

> Examination revealed that Robles' nipples had been excised, as well as
> portions of her labia minor, majora and clitoris.

> The police recovered from the scene a Winn-Dixie bag with a receipt inside,
> and another receipt reflecting the purchase of some groceries which were found
> scattered near Robles' body. [n1] Robles was found wearing a watch, apparently
> broken during the murder, which was cracked and stalled at 3 a.m. Additionally,
> among the items recovered strewn around her body were food stamps and a pager.

>> [n1] Juanita Roberson, a Winn-Dixie night clerk working the early
>> morning hours of October 15, testified that Robles, accompanied by
>> Mansfield, made the purchases reflected in the receipts recovered by
>> the police at the scene.

> The ensuing investigation revealed that the receipts found near Robles'
> body reflected purchases made roughly at 2:35 and 2:36 a.m. [n2] The police then
> questioned Jesus Alfonso, a friend of Robles, who visited with Robles the previous
> evening. Alfonso told police that he and Robles went to Rosie's Pub, located in the
> same shopping plaza as the Winn-Dixie. Alfonso left the bar at 1:30 a.m., but

Robles remained at the bar playing pool with a male whose description matched Mansfield's.

> [n2] The receipts found at the crime scene indicated that the documented purchases were made at 1:35 and 1:36 a.m. However, when the police took the receipts to the Winn-Dixie and had the assistant manager run some receipts to check the accuracy of the time reflected therein it was discovered that the registers were approximately an hour behind.

Karen Hill, a bartender at Rosie's Pub, was then interviewed and indicated that Robles was at the bar the previous evening in the company of Mansfield. According to Hill, Mansfield, Robles, and a third individual by the name of William Finneran exited the bar together shortly after 2 a.m.

After speaking with other witnesses confirming that Robles was in the company of Mansfield and Finneran during the early morning hours of October 15, the police questioned Finneran who indicated that he had exited the bar with Mansfield and Robles shortly after 2 a.m. and that he last saw them around 3 a.m. at Winn-Dixie.

The police, after learning that the pager found at the murder scene was traced to Mansfield, focused their investigation on him. Additionally, the police interviewed Juanita Roberson, a Winn-Dixie night clerk, who indicated that Robles purchased the items reflected in the recovered receipts with a man whose description matched Mansfield's and that Robles was in the company of that same man outside the Winn-Dixie when Roberson took her break at approximately 3 a.m. the night of the murder. With this information in hand, three detectives went to Mansfield's residence the night following the murder to question him. Mansfield agreed to be interviewed by the detectives at the police station.

Prior to being transported to the station, the detectives noticed that Mansfield had fresh scratches on his knees and hands. Once at the station, he avoided and inconsistently answered many of the questions posed to him during the roughly two-and-a-half hour videotaped session. Specifically, Mansfield admitted to being at Rosie's Pub with Robles, but initially insisted that he had gone directly home after leaving the bar. Following further questioning, he begrudgingly admitted going to Winn-Dixie after leaving Rosie's Pub.

Shortly before the interrogation ended, the police received further evidence placing Mansfield at the scene of the crime. Juanita Roberson, the Winn-Dixie night clerk, identified Mansfield in a photograph lineup at the police station as the man she saw with Robles ouside the Winn-Dixie the previous evening at

approximately 3 a.m. The detectives directed Mansfield to lift his shirt at which time they observed a bruise on his chest. The police then arrested Mansfield and took into evidence a ring he was wearing with a distinctive "grim reaper" design.

The following day, Mansfield's brother, Charles, called the police and asked them to come down to his apartment to gather some items found in Mansfield's room. Once there, the police recovered food stamps, a knife and sheath, clothing, and a towel. [n3]

> [n3] During its case in chief, the State's senior crime lab analyst, David Baer, testified as to the results of DNA and blood testing done on the items recovered from Mansfield's room. His testimony established that some of the items had blood that was consistent with Mansfield's. The tests conducted on the items recovered from Mansfield's room, however, did not reveal the presence of Robles' blood.

While at the apartment the police also questioned Mansfield's 10-year-old niece, Melissa [Johnson], who told them that Mansfield arrived home on the morning of October 15 at about 4:30. Melissa told police that Mansfield came to the door soaking wet, wearing shorts but no shirt, and carrying his shoes. Melissa told police she gave Mansfield a towel at his request, and that she noticed what appeared to be a small blood stain on his shorts. [n4]

> [n4] During Mansfield's interrogation with police the previous evening, Mansfield told police that he had taken a swim in the pool in the early morning hours of October 15 before entering the apartment and that his niece saw him enter the apartment afterwards.

The State introduced several other witnesses at trial who placed Mansfield with Robles at or near the crime scene at approximately the time the murder was presumed to have occurred. The State's medical examiner, Dr. Julie Martin, testified as to the existence of a pattern injury on the neck of Robles consistent with the pattern found on the "grim reaper" ring removed from Mansfield following his arrest.

Dr. Martin testified that Robles died of asphyxia due to airway compression as a result of blunt force trauma to the neck. Specifically, Dr. Martin opined that the murderer, while straddling Robles, strangled her with one hand, using the other hand or an object (the ring) to press down on her lower neck, causing her trachea to collapse. She further testified as to the existence of extensive bruising about Robles' eye, neck and collarbone. Dr. Martin concluded that Robles was conscious and struggling to breathe for "more than a few minutes" before becoming

-4-

unconscious. According to Dr. Martin, Robles was alive but most likely unconscious when parts of her genitalia were excised by a sharp object consistent with the knife recovered from Mansfield's room.

The State also introduced the testimony of convicted felon Michael Derrick Johns who recounted a jailhouse conversation with Mansfield in which Mansfield confessed to Robles' murder. The defense did not present any evidence.

The jury, after being instructed on both first-degree premeditated murder and first-degree felony murder, found Mansfield guilty of first-degree murder. The jury unanimously recommended the death penalty. The trial court followed the recommendation and sentenced Mansfield to death.

In support of the death sentence, the trial judge found two aggravating circumstances: (1) the crime was especially heinous, atrocious, or cruel; and (2) the crime was committed during the commission of or an attempt to commit a sexual battery. The court found no statutory mitigation and five nonstatutory mitigators and found the following three mitigators were entitled to very little weight: (1) the defendant's good conduct during trial; (2) the defendant is an alcoholic; and (3) the defendant's mother was an alcoholic during his childhood. The court accorded the remaining two mitigators some weight: (1) the defendant had a poor upbringing and dysfunctional family; and (2) the defendant suffers from a brain injury due to head trauma and alcoholism.

*Mansfield v. State*, 758 So. 2d 636, 640-42 (Fla. 2000) [hereinafter *"Mansfield I"*].

## II.  PROCEDURAL HISTORY

On direct appeal, Petitioner raised ten claims. *Mansfield I* at 642; (App. A55).[1] On March 30, 2000, the Florida Supreme Court issued its opinion affirming Petitioner's conviction and death sentence. *Id.*; (App. A58). Petitioner filed a Petition for Writ of Certiorari with the United States Supreme Court, and the Court denied certiorari on April 23, 2001. *Mansfield v. Florida*, 532 U.S. 998 (2001); (Apps. B1, B3).

---

[1] References to the record will be made by citing to the particular exhibit and page number therein as indicated in Respondents' Master Index to Appendix. *See* Doc. No. 17 at 3-11. For example, "App. A55 at 1" refers to page 1 of the exhibit labeled A55.

On April 19, 2002, Petitioner filed his motion for post-conviction relief (styled as "Second Amended Motion for Postconviction Relief") pursuant to Florida Rules of Criminal Procedure 3.850 and 3.851, raising sixteen claims. (App. D1 at 74-147). Petitioner then filed a motion to disqualify the trial judge based on comments the judge made when he presided over the penalty phase of Petitioner's trial. (App. D1 at 151-58). The trial court denied the motion, and Petitioner filed a Petition for Writ of Prohibition with the Florida Supreme Court. (App. C1). On September 6, 2002, the Florida Supreme Court denied the petition. *Mansfield v. State*, 826 So. 2d 992 (Fla. 2002); (App. C2).

The trial court granted Petitioner an evidentiary hearing on fifteen of Petitioner's sixteen post-conviction claims.[2] At the outset of the hearing, Petitioner waived the majority of his post-conviction claims related to mitigation. (App. D6 at 530-35). On June 30, 2003, the trial court entered an order denying all of Petitioner's claims. (App. D3 at 443-77). Petitioner appealed the denial of his post-conviction motion and simultaneously filed a Petition for Writ of Habeas Corpus with the Florida Supreme Court. (Apps. D36, D37). In a consolidated opinion, the Florida Supreme Court denied all relief on July 7, 2005. *Mansfield v. State*, 911 So. 2d 1160 (Fla. 2005) [hereinafter "*Mansfield II*"]; (App. D42). Petitioner filed a motion for rehearing, and that motion was denied on September 15, 2005. (Apps. D43, D44). Petitioner filed the instant petition on October 3, 2005. *See* Doc. No. 1.

---

[2] Petitioner did not request an evidentiary hearing on his sixteenth claim.

## III.    GOVERNING LEGAL PRINCIPLES

Because Petitioner filed his petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Henderson v. Campbell*, 353 F.3d 880, 889-90 (11th Cir. 2003). AEDPA "establishes a more deferential standard of review of state habeas judgments," *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001), in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002); *see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (recognizing that the federal habeas court's evaluation of state-court rulings is highly deferential and that state-court decisions must be given the benefit of the doubt).

### A.    Standard of Review Under AEDPA

Pursuant to AEDPA, habeas relief may not be granted with respect to a claim adjudicated on the merits in State court unless the adjudication of the claim:

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The phrase "clearly established Federal law," encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Schwab v. Crosby*, 451 F.3d 1308, 1324 (11th Cir. 2006), *cert. denied*, 549 U.S. 1169 (2007).

"[S]ection 2254(d)(1) provides two separate bases for reviewing state court decisions; the 'contrary to' and 'unreasonable application' clauses articulate independent considerations a federal court must consider." *Maharaj v. Secretary for Dep't. of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005). The meaning of the clauses was discussed by the Eleventh Circuit Court of Appeals in *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001) (quoting *Williams*, 529 U.S. 362, 412 (2000)):

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

If the federal court concludes that the State court applied federal law incorrectly, habeas relief is appropriate only if that application was "objectively unreasonable." *Id.*

Finally, under § 2254(d)(2), a federal court may grant a writ of habeas corpus if the State court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." A determination of a factual issue made by a State court, however, shall be presumed correct, and the habeas petitioner shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. *See Parker*, 244 F.3d at 835-36; 28 U.S.C. § 2254(e)(1).

## B.    Standard for Ineffective Assistance of Counsel

In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance: (1) whether counsel's performance was

deficient and "fell below an objective standard of reasonableness"; and (2) whether the deficient performance prejudiced the defense.[3] *Id.* at 687-88. A court must adhere to a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 689-90. "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690; *Gates v. Zant*, 863 F.2d 1492, 1497 (11th Cir. 1989); *see also White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992). Accordingly, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

## IV.    ANALYSIS

Petitioner asserts fifteen claims for relief in his federal habeas petition. Upon thorough review and consideration of each claim, the Court has determined that Petitioner's *Miranda* claim (Claim One) warrants detailed review. It will, therefore, be discussed in the final portion of this opinion. *See* Part IV, B, *infra*. Claims Two through Fifteen require less discussion and will therefore be addressed first.

### A.    Non-*Miranda* Claims

### 1.    Claims Two and Six - Heinous, Atrocious, or Cruel Aggravator

Petitioner ascribes constitutional error to the trial court's determination that the heinous, atrocious, or cruel ("HAC") aggravator applied to his case because it was not supported by the

---

[3]In *Lockhart v. Fretwell*, the United States Supreme Court clarified that the prejudice prong of the test does not focus solely on mere outcome determination; rather, to establish prejudice, a criminal defendant must show that counsel's deficient representation rendered the result of the trial fundamentally unfair or unreliable. 506 U.S. 364, 372 (1993).

evidence (Claim Two). Petitioner also asserts that the standard jury instruction given at the penalty phase on the HAC aggravator was unconstitutional because it failed to adequately channel the jury's discretion in recommending a death sentence (Claim Six).

At the penalty phase, the trial judge denied defense counsel's proposed jury instruction on the HAC aggravator[4] and instead instructed the jury:

> Heinous means extremely wicked or shockingly evil. Atrocious means outrageously wicked and violent. Cruel means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others.
>
> The kind of crime intended to be included as heinous, atrocious, or cruel is one accompanied by additional acts that show that the crime was conscienceless or pitiless and was unnecessarily torturous to the victim.

(App. A51 at 98-99). In its Sentencing Order, the trial court found that the HAC aggravator had been proven beyond reasonable doubt. (*See* App. A5 at 1131-35). In making this determination, the trial court reasoned that the victim had been "savagely beaten and strangled" and her murder was "conscienceless, pitiless and unnecessarily torturous." (App. A5 at 1134-35). The trial court further stated that the victim undoubtedly suffered a "slow, painful, and torturous death" in that she was alive and conscious for several minutes while gasping for air, knowing that she was about to die. (App. A5 at 1134).

---

[4] The proposed jury instruction read as follows:

To be heinous, atrocious, or cruel, the Defendant must have deliberately inflicted or consciously chosen a method of death with the intent to cause extraordinary mental or physical pain to the victim, and the victim must have actually, consciously suffered such pain for a substantial period of time before death.

(App. A3 at 464).

On direct appeal, Petitioner argued that it was pure speculation as to whether the victim suffered during the attack because the medical examiner could not state within a degree of medical certainty exactly how long it took for the victim to lose consciousness. Without this determination, Petitioner asserted, the HAC aggravator could not be established. Further, he alleged that it was likely the victim was not conscious during the attack because the victim's blood alcohol level was over the legal limit. The Florida Supreme Court rejected these arguments and concluded that the trial court's HAC determination was supported by substantial competent evidence. *Mansfield I*, 758 So. 2d at 645-46.

In Claim Two, Petitioner presents the same arguments he presented on direct appeal and asserts that the State courts unreasonably determined that the HAC aggravator applied to his case. Respondents assert that this claim is procedurally barred because Petitioner did not raise this claim on direct appeal as a federal constitutional violation, but rather as a factual determination made under State law. Upon review of the record, Respondents are correct. Claim Two is procedurally barred from review by this Court and is accordingly denied.

With respect to Claim Six, Respondents similarly assert that this claim is procedurally barred because Petitioner did not raise the claim on appeal as one involving a federal constitutional issue. However, on direct appeal Petitioner argued that the standard HAC jury instruction used at trial violated both the Florida and United States Constitutions. Therefore, Petitioner satisfied the exhaustion requirement, and this claim is properly subject to review. *See Baldwin v. Reese*, 541 U.S. 27, 32 (2004).

Prior to trial, Petitioner's counsel moved to declare the standard jury instruction on HAC unconstitutional and proposed a jury instruction emphasizing that the victim must have

-11-

consciously suffered pain for the aggravator to apply. On appeal, the Florida Supreme Court rejected Petitioner's argument that the trial court erred in denying his requested jury instruction and reaffirmed, as it had on prior occasions, the constitutionality of the objected-to HAC instruction. *See Mansfield I*, 758 So. 2d at 649.

Upon review of Claim Six, the Court finds that the Florida Supreme Court did not reach a determination that was contrary to, or involved an unreasonable application of, clearly established federal law. Additionally, there is no indication that the result reached by the Florida Supreme Court was at odds with any United States Supreme Court case which considered materially indistinguishable facts. Petitioner has not shown that the instruction was in any manner invalid at the time it was provided to the jury. The trial court used the standard HAC jury instruction, which the Florida Supreme Court and the Eleventh Circuit have consistently upheld against constitutional vagueness challenges. *See, e.g., Johnson v. State*, 660 So. 2d 637 (Fla. 1995), *cert. denied*, 517 U.S. 1159 (1996); *Preston v. State*, 607 So. 2d 404, 410 (Fla. 1992); *Marquard v. Sec'y for Dep't of Corr.*, 429 F.3d 1278, 1317 (11th Cir. 2005). Accordingly, Claim Six is denied.

### 2.   Claim Three - Proportionality of Sentence

Petitioner claims that his death sentence is disproportionate in comparison to other Florida cases and that such arbitrary application of the death penalty violates the Eighth and Fourteenth Amendments to the United States Constitution.

Petitioner challenged the proportionality of his sentence on direct appeal and the Florida Supreme Court found Petitioner's death sentence proportionate when compared to other cases in which the court found death to be the appropriate penalty. *Mansfield I*, 758 So. 2d 636 at 647. Petitioner argues that the State court failed to reasonably compare his case to other cases in which

-12-

death was found to be non-proportional. In addition, Petitioner requests this Court to address the question of the proportionality of his death sentence on a national scope.

The United States Supreme Court has held that proportionality review is not required by the United States Constitution. *See Pulley v. Harris*, 465 U.S. 37 (1984). In addition, where State law requires proportionality review, the Eleventh Circuit has held that

> A federal habeas court should not undertake a review of the state supreme court's proportionality review and, in effect, "get out the record" to see if the state court's finding of fact, their conclusion based on a review of similar cases, was supported by the "evidence" in the similar cases. To do so would thrust the federal judiciary into the substantive policy making area of the state.

*Moore v. Balkcom*, 716 F.2d 1511, 1518 (11th Cir. 1983) (citation omitted). Moreover, the Eleventh Circuit has rejected the argument that federal law requires those State courts which are required to undertake such review to "make an explicit detailed account of their comparisons." *Lindsey v. Smith*, 820 F.2d 1137, 1154 (11th Cir. 1987).

To the extent Petitioner challenges the Florida Supreme Court's proportionality review and seeks to have the Court conduct a *de novo* proportionality review of his sentence, he is not entitled to such relief. The Florida Supreme Court conducted a proportionality review as required by Florida law and determined that no re-sentencing was warranted. This procedure was not done arbitrarily or capriciously and provided an adequate safeguard of Petitioner's rights. Accordingly, this claim is denied.

### 3. Claim Four - Findings Related to Non-Statutory Mitigating Factors

Petitioner contends that the trial court failed to fully consider and adequately weigh certain non-statutory mitigating factors in violation of the Eighth and Fourteenth Amendments to the United States Constitution. In connection with this claim, Petitioner refers to the following non-

statutory mitigating factors: (1) he served his country in the military; (2) he completed a substance abuse and mental health program; (3) he had never been convicted of a violent felony; and (4) assuming he committed the offense, he did so while he was intoxicated.

During the penalty phase, Petitioner's trial counsel introduced evidence of Petitioner's service in the military by presenting his discharge papers. Although the military record indicated that Petitioner's discharge was under honorable conditions, it also indicated that it was an expeditious discharge for failure to maintain acceptable standards for retention. (*See* App. A51 at 1101-02). In light of the type of discharge Petitioner received, the trial court found that this mitigating circumstance was not proven. (App. A5 at 1137). Additionally, trial counsel entered into evidence a certificate of recognition Petitioner purportedly received for completion of a substance abuse and mental health program in 1994. (App. A51 at 1101). However, the trial court discounted this mitigating circumstance because the certificate only indicated that Petitioner's attendance and efforts in the program were excellent and not that he successfully completed the program. (App. A5 at 1139).

With respect to Petitioner's contention that he had never been previously convicted of a violent felony, the trial court found that it was not a valid mitigating factor to be considered. (App. A5 at 1139). Finally, the trial court found Petitioner to be an alcoholic and accorded this mitigating circumstance very little weight.

> Based upon the testimony, it is quite clear that the defendant has had a long history of alcohol abuse dating back many years. It is also clear that the defendant was drinking the night of this crime. But there is no evidence to show that at the time of the commission of this horrible crime that he did not know what he was doing or that alcohol has [sic] affected him in any way. The statements by the defendant to Michael Johns about what he did to the victim shows that he was keenly aware of what he was doing.

-14-

(App. A5 at 1138).

On appeal, Petitioner ascribed error in the trial court's findings on the proposed mitigators. The Florida Supreme Court agreed that Petitioner's service in the military and completion of a substance abuse and mental health program were not established by the evidence presented at the penalty phase. *See Mansfield I*, 758 So. 2d at 646. Additionally, the Florida Supreme Court found no error in the rejection of Petitioner's non-existent violent felony record to be a valid mitigating factor. *Id.* Finally, in considering Petitioner's argument that the trial court erred in its decision to accord the voluntary intoxication mitigator little weight, the Florida Supreme Court agreed with the trial court's finding and found it consistent with precedent. *Id.* at 646-47 (citing *Raleigh v. State*, 705 So. 2d 1324, 1330 (Fla. 1997)).

To the extent Petitioner challenges the State courts' findings, he has not carried his burden under § 2254(e). As such, he has failed to demonstrate that the resolution of this claim was based on an unreasonable determination of the facts in light of the evidence presented, and this claim is therefore denied pursuant to § 2254(d). Furthermore, to the extent Petitioner challenges the amount of weight given to these mitigating factors, federal law provides him no relief. "The Constitution requires that the sentencer be allowed to consider and give effect to evidence offered in mitigation, but it does not dictate the effect that must be given once the evidence is considered; it does not require the sentencer to conclude that a particular fact is mitigating or to give it any particular weight." *Schwab v. Crosby*, 451 F.3d 1308, 1329 (11th Cir. 2006) (citing *Harich v. Wainwright*, 813 F.2d 1082, 1101 (11th Cir. 1987)); *see also Magwood v. Smith*, 791 F.2d 1438, 1449 (11th Cir. 1986). Accordingly, this claim is denied.

4.    **Claim Five - Admission of Evidence**

  *a.    Knife and Sheath*

Petitioner asserts that the trial court erred in admitting the knife and sheath into evidence because the admission of this evidence was more prejudicial than probative. Specifically, Petitioner argues that the State failed to link the knife to him and establish that it was the same knife used in the homicide. *See* Doc. No. 1 at 23. As a result, Petitioner claims the jury was allowed to falsely assume that he was in possession of the murder weapon at the time of his arrest.

Prior to trial, defense counsel filed a motion in limine to exclude the knife and sheath, (App. A4 at 844-45), which the trial court denied. (App. A42 at 2528). On appeal, Petitioner argued that the knife and sheath were not sufficiently linked to him, did not have any evidentiary value, and that the State failed to adequately demonstrate that the knife was used in the victim's murder. In denying relief, the Florida Supreme Court determined that the trial court did not abuse its discretion in admitting the knife and sheath into evidence. *Mansfield I*, 758 So. 2d at 648 (footnote and citation omitted).

A federal court deciding a habeas petition will not review a trial court's actions in the admission of evidence unless the admission creates a "fundamental unfairness" in the trial. *Osborne v. Wainwright*, 720 F.2d 1237, 1239 (11th Cir. 1983); *see also Futch v. Dugger*, 874 F.2d 1483, 1487 (11th Cir. 1989). The evidence must be inflammatory or gruesome, and so critical that its introduction denied petitioner a fundamentally fair trial. *Osborne*, 720 F.2d at 1239; *see also Dickson v. Wainwright*, 683 F.2d 348, 350 (11th Cir. 1982). In other words, the admission of prejudicial evidence justifies habeas relief only if the evidence "is material in the sense of a

crucial, critical, highly significant factor." *Hills v. Henderson*, 529 F.2d 397, 401 (5th Cir. 1976) (quoting *Corpus v. Beto*, 469 F.2d 953, 956 (5th Cir. 1972)).

Even if there was error in the admission of the knife and sheath,[5] Petitioner has failed to demonstrate that this error tainted the fundamental fairness of his trial. The State's medical examiner was thoroughly questioned by both the prosecutor and defense counsel regarding the victim's injuries and whether the wounds could have been inflicted by the knife that was turned over to police by Petitioner's brother. In responding to these questions, the medical examiner merely represented that some of the victim's injuries could have been produced by *a* knife and these wounds were consistent with certain characteristics of *the* knife found in Petitioner's room. However, she further indicated that it was possible that another knife could have caused the victim's injuries. (*See* Apps. A45 at 472-74; A46 at 514, 517). In light of this testimony, Petitioner has failed to demonstrate fundamental unfairness. Accordingly, the Florida Supreme Court's denial of this claim on direct appeal was not contrary to or an unreasonable application of clearly established federal law, nor was it an unreasonable application of the facts in light of the evidence presented. Accordingly, this claim is denied.

>    b.    *Photographs*

In addition to the knife and sheath, Petitioner challenged the admission of photographs depicting the mutilation of the victim's genitalia and an autopsy photograph of the victim's brain, arguing that they were unnecessary and served no other purpose other than to inflame the passions of the jury and further prejudice Petitioner.

---

[5] Indeed, this Court would not have admitted this evidence.

Pursuant to Florida law, "[t]he admission of photographs is within the trial court's discretion," and the appellate court's review of the trial court's ruling is based on whether the trial court abused its discretion. *Manley v. State*, 677 So. 2d 104, 105 (Fla. 5th DCA 1996). On appeal, the Florida Supreme Court concluded that the trial court did not abuse its discretion in admitting the photographs because they "were relevant to the medical examiner's determination as to the manner of the victim's death, and were probative in the determination of the heinous, atrocious, or cruel and sexual battery aggravators." *Mansfield I*, 758 So. 2d at 648.

Prior to admitting these photographs into evidence, the trial court reviewed each picture, heard argument from both sides, as well as from the state medical examiner, and determined that each of the photographs was relevant and not duplicative. (*See* App. A41 at 2236-38). As noted above, in order for an evidentiary error to warrant habeas relief, the admission of the evidence must have rendered the proceeding fundamentally unfair. *See Dickson*, 683 F.2d at 350. However, "[t]he introduction of graphic photographic evidence rarely renders a proceeding fundamentally unfair." *Jacobs v. Singletary*, 925 F.2d 1282, 1296 (11th Cir. 1992); *see also, e.g., Gonzalez v. DeTella*, 127 F.3d 619, 621 (7th Cir. 1997). Nothing in the record indicates that the photographs were erroneously admitted. The photographs were relevant and served to corroborate the medical examiner's testimony concerning the manner of death and the victim's state of consciousness during the attack. Accordingly, this claim is denied.

### 5.     Claims Seven and Fourteen - Trial Judge's Comments

The basis for Claims Seven and Fourteen concern statements which the trial judge made on the record to counsel, outside the presence of the jury, during the penalty phase of Petitioner's trial. The statement was made after Petitioner's trial counsel told the trial judge that the State had

made a plea offer to Petitioner of life in prison without the possibility of parole if Petitioner would admit his guilt and waive all rights to appeal.

Petitioner did not raise any issue regarding the trial judge's comments on direct appeal, but first raised the issue in his State post-conviction proceeding. Shortly after filing his State post-conviction motion, Petitioner filed a motion to disqualify the post-conviction judge, who also served as his trial judge, based on the claim in his post-conviction motion alleging judicial bias. (App. D1 at 151-60). The post-conviction judge denied the motion, finding it to be legally insufficient. (App. D2 at 220-21). Thereafter, Petitioner filed a Petition for Writ of Prohibition with the Florida Supreme Court seeking to prohibit the judge from presiding over any further proceedings in the case, and the court denied the petition. (Apps. C1; C2). Petitioner's post-conviction motion proceeded to an evidentiary hearing, and thereafter, the post-conviction judge denied Petitioner's claim related to his comments made at Petitioner's trial.[6] Petitioner appealed, and the Florida Supreme Court denied relief, finding the claim procedurally barred. *Mansfield II*, 911 So. 2d at 1170-71. Even assuming that the claim was not barred, the Florida Supreme Court concluded that Mansfield had failed to demonstrate that he had a well-founded fear that he would not receive a fair trial. *Id.*

In his instant petition, Petitioner raises the same claims he raised in his State post-conviction proceedings. First, Petitioner asserts that the trial judge's comments indicated bias in

---

[6] The post-conviction court denied relief for the following three reasons: (1) the claim should have been raised on direct appeal; (2) the Court was merely expressing frustration that the State had waited until such a late stage in the proceedings to offer a plea bargain; and (3) the issue was brought before the Florida Supreme Court in a petition for writ of prohibition, which the appellate court denied. (App. D3 at 475-76).

favor of the State and the death penalty, and as such, he was denied his right to a fair and impartial tribunal. As the Florida Supreme Court found, this claim is procedurally barred because Petitioner did not make a timely motion to disqualify the judge. Petitioner attempts to overcome this procedural bar by asserting that his trial counsel rendered ineffective assistance by failing to timely file a motion to disqualify. However, this procedural default will be excused only if Petitioner can show both cause for the default and actual prejudice resulting from the default. *See Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2008).

To establish cause, "a petitioner must demonstrate that some objective factor external to the defense impeded [his] effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). To establish prejudice, a petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different had the claim been presented. *Henderson*, 353 F.3d at 892 (citations omitted). The United States Supreme Court has stated that a claim of ineffective assistance will support a finding of cause for a procedural default only if counsel's performance was "so ineffective as to violate the Federal Constitution." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). Thus, in order for ineffective assistance of counsel to serve as cause for Petitioner's procedural default, he must be able to satisfy the exacting standards of *Strickland*. *Brownlee v. Haley*, 306 F.3d 1043, 1066 (11th Cir. 2002). If Petitioner "cannot prevail on a separate ineffective assistance of counsel claim, then he cannot prevail on an argument that ineffective assistance caused the procedural default." *Id.*

Having thoroughly reviewed the record and the trial judge's putatively improper remarks, the Court rejects any argument that Petitioner's trial counsel was ineffective for failing to file a timely motion to disqualify the trial judge. Like the State courts, this Court also reads the trial

judge's comments to be an expression of frustration regarding the timing of the State's plea offer and in no way indicative of bias or prejudice against Petitioner. Thus, because Petitioner's claim of ineffective assistance of counsel is inadequate to constitute cause to overcome the procedural default, Petitioner's claim that he was denied a fair and impartial tribunal is not subject to federal habeas review.

Petitioner's final claim related to this matter is that his appellate counsel rendered ineffective assistance by failing to raise the issue of judicial bias on direct appeal. This claim was considered and rejected by the Florida Supreme Court in Petitioner's state habeas petition on the basis that the claim would have been procedurally barred on direct appeal. *See Mansfield II*, 911 So. 2d at 1179. In any event, the Florida Supreme Court concluded that, even if the claim had been preserved for appeal, appellate counsel was not ineffective for failing to raise it "because the judge's comments did not indicate that he was biased against [Petitioner] or that he had predetermined the appropriate sentence to be given." *Id.*

Having already determined that the trial judge's comments did not indicate bias or prejudice, the Court concludes that Petitioner's ineffective assistance of appellate counsel claim must also fail. The Florida Supreme Court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Petitioner has also failed to demonstrate that the state court made an unreasonable determination of the facts. Accordingly, this claim is denied.

### 6. Claim Eight - IAC for Failure to File Motion to Suppress

Petitioner claims that trial counsel rendered ineffective assistance by failing to file a motion to suppress the introduction into evidence of his "grim reaper" ring and the photographs taken of

his torso following his interrogation. Petitioner raised this claim in his motion for post-conviction relief. Following an evidentiary hearing, the State court denied the claim. (App. D3 at 461-62). Petitioner appealed, and the Florida Supreme Court affirmed, finding probable cause for the arrest and, therefore, no illegal seizure or improper photographs. *Mansfield II*, 911 So. 2d at 1175 (internal citations omitted).

"To obtain relief where an ineffective assistance claim is based on counsel's failure to file a timely motion to suppress, petitioner must prove: (1) that counsel's representation fell below an objective standard of reasonableness, (2) that the Fourth Amendment claim is meritorious, and (3) that there is a reasonable probability that the verdict would be different absent the excluded evidence." *Zakrzewski v. McDonough*, 455 F.3d 1254, 1260 (11th Cir. 2006) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986)).

As noted by the Florida Supreme Court, Petitioner predicates his ineffective assistance of counsel claim on the theory that law enforcement officers lacked probable cause to arrest him and that his arrest was the result of law enforcement's improper interrogation. Therefore, according to Petitioner, his ring and the photographs of his torso were "fruits of an improper arrest and should not have been admitted." *Mansfield*, 911 So. 2d at 1175.

The Court finds no merit in the suggestion that law enforcement lacked probable cause to arrest Petitioner. Probable cause exists "if the facts and circumstances within the collective knowledge of the law enforcement officials, of which they had reasonable trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed." *Madiwale v. Savaiko*, 117 F.3d 1321, 1324 (11th Cir. 1997) (quoting *United States v. Jimenez*, 780 F.2d 975, 978 (11th Cir. 1986)); *see also Beck v. Ohio*, 379 U.S. 89, 91 (1964).

Testimony adduced at the pre-trial hearing held on October 20, 1997, demonstrates that detectives had sufficient evidence tying Petitioner to the victim and the murder scene at the time Petitioner was questioned and subsequently arrested. Specifically, before Petitioner was interviewed, detectives had already spoken with individuals who identified Petitioner as one of the last two people seen with the victim the night of her death. (*See* App. A41 at 2356-57, 2383, 2391-95). Furthermore, detectives had already traced the pager found at the murder scene to Petitioner and, sometime during the interrogation, were informed that the Winn-Dixie clerk had identified Petitioner from a photo array as the man seen in the store with the victim shortly before her murder. (*See* App. A41 at 2383, 2391-95, 2402-03). On direct appeal, the Florida Supreme Court discussed the chronology of events surrounding law enforcement's investigation and questioning of Petitioner when it considered Petitioner's *Miranda* claim. See *Mansfield I*, 758 So. 2d at 640-45. During this discussion, the Florida Supreme Court noted that law enforcement officers possessed "evidence strongly suggesting [Petitioner's] guilt" during the interrogation. *Mansfield I*, 758 So. 2d at 644. Based on the totality of the information, this Court concludes that law enforcement had sufficient probable cause to arrest Petitioner for the murder of Sara Robles.

Having determined that Petitioner's arrest was lawful, the Court finds that it was permissible for the officers to subsequently take Petitioner's ring as part of a search incident to a lawful arrest. Moreover, Petitioner's ring was not taken into police custody until after a judge had reviewed the charging affidavit and found probable cause for Petitioner's arrest on October 16, 1995. (*See* App. A1 at 1). The ring was then placed with his personal items in the property room at the Osceola County Jail and later obtained by investigating officers from the Kissimmee Police Department.

It is well established that once a suspect is in custody, the items on his person at the time of his arrest may lawfully be searched and seized without a warrant. *See, e.g., United States v. Edwards*, 415 U.S. 800 (1974). "Indeed," as the *Edwards* Court stated, "it is difficult to perceive what is unreasonable about the police's examining and holding as evidence those personal effects of the accused that they already have in their lawful custody as the result of a lawful arrest." *Id*. at 806. Although Petitioner attempts to distinguish *Edwards* from the instant case in his reply brief, the Court finds his arguments unavailing.

Based on the holding of *Edwards*, trial counsel had no legal basis upon which to file a motion to suppress. Trial counsel even testified at the post-conviction evidentiary hearing that she did not move to suppress the ring because she felt there was no basis for the motion. (App. D7 at 825-27). Because Petitioner cannot establish that his Fourth Amendment claim is meritorious, his claim of ineffective assistance of counsel for failure to file a motion to suppress his ring must fail.

Similarly, Petitioner's claim that trial counsel rendered ineffective assistance for failing to file a motion to suppress the photographs of his torso is also without merit. Although the Florida Supreme Court determined that Petitioner's videotaped interrogation was erroneously admitted because he was clearly in custody and officers failed to give him *Miranda* warnings, the officers still had probable cause to effect Petitioner's arrest. A law enforcement officer's failure to give *Miranda* warnings prior to a custodial interrogation does not render physical evidence obtained subsequent to an improper interrogation inadmissible. *See generally United States v. Patane*, 542 U.S. 630, 641-42 (2004).[7]

---

[7] In *United States v. Patane*, 542 U.S. 630 (2004), police officers seized a gun after the defendant, in response to custodial questioning without *Miranda* warnings, disclosed the gun's

Irrespective, then, of law enforcement's failure to give Petitioner *Miranda* warnings,

Petitioner was lawfully arrested and the photographs were taken incident to his lawful arrest. As

such, trial counsel would have been unsuccessful in an attempt to suppress the photographs. The

State courts' conclusions in this regard were neither objectively unreasonable nor were they

contrary to or an unreasonable application of clearly established federal law. Accordingly, these

claims are denied.

### 7.    Claim Nine - *Giglio* Violation

Petitioner next asserts that the State presented false or misleading testimony from Michael

Derek Johns, also known as Christopher Randall ("Randall"), a jailhouse inmate who testified at

Petitioner's trial that Petitioner made a number of incriminating statements to him while the two

were sharing a holding cell at the Osceola County Courthouse. Specifically, Petitioner

characterizes Randall's trial testimony concerning, *inter alia*, the status of certain pending federal

charges against him as false and misleading and asserts that the State knew of its falsity and failed

to correct it in violation of *Giglio v. United States*, 405 U.S. 150 (1972).

Petitioner raised this claim for the first time in his motion for post-conviction relief. The

trial court denied the claim, and Petitioner appealed. On appeal, the Florida Supreme Court

considered Petitioner's *Giglio* claim and found it to be without merit. *Mansfield II*, 911 So. 2d at

1176-78. Nevertheless, Petitioner attacks the findings made by the Florida Supreme Court and

---

location and gave officers permission to retrieve it. The Court considered whether the failure to give
*Miranda* warnings required suppression of the subsequently located gun. A majority of five justices
held that the firearm was admissible. Justice Thomas, writing for a plurality, explained that "the
*Miranda* rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause"
and "the Self-Incrimination Clause . . . is not implicated by the admission into evidence of the physical
fruit of a voluntary statement." *Id*. at 636-37.

contends that the prosecution "failed in its obligation to present Mr. Randall's testimony in an accurate and truthful manner" and "Mr. Randall's falsehoods and omissions deprived the jury of critical information which bore directly on his credibility and motivation to fabricate testimony." (Doc. No. 1 at 48, 52.)

Under *Napue v. Illinois*, 360 U.S. 264, 269 (1959), and *Giglio v. United States*, 405 U.S. 150, 153-54 (1972), a defendant's due process rights are violated when the prosecution knowingly fails to correct a material falsehood in the testimony of any witness. This rule covers not only inculpatory false testimony, but also falsehoods tending to enhance the credibility of a witness. *Napue*, 360 U.S. at 269. "[T]he falsehood is deemed to be material 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *United States v. Alzate*, 47 F.3d 1103, 1110 (11th Cir. 1995) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). The thrust of *Giglio* and its progeny has been to ensure that the jury knows the facts that might motivate or bias a witness, and to ensure that the prosecutor does not fraudulently conceal such facts from the jury. *Ventura v. Att'y Gen., Fla.*, 419 F.3d 1269, 1282 (11th Cir. 2005).

To establish a *Giglio* violation, a defendant must demonstrate that the testimony was false, that the State knew the testimony was false, and that the false testimony was material (i.e., there was a reasonable likelihood that the false testimony could have affected the judgment of the jury). *DeMarco v. United States*, 928 F.2d 1074 (11th Cir. 1991). In other words, to prevail on his *Giglio* claim, Petitioner "must establish that the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material." *Maharaj v. Sec'y for the Dep't of Corr.*, 432 F.3d 1292, 1312 (11th Cir. 2005) (citation omitted). The false testimony is material when it could reasonably be taken to put the whole case

in such a different light as to undermine confidence in the verdict. *United States v. Dickerson*, 248 F.3d 1036, 1042 (11th Cir. 2001).

It is clear that Randall is a professional crook with an amazing ability to coax fellow inmates into confessing their crimes. He is also an habitual snitch, having testified or provided incriminating information against at least twenty (20) of his fellow inmates. In this case, he received Petitioner's confession (and that of another cell mate) while in a courthouse holding cell. Ostensibly, Petitioner, while fighting first degree murder charges, decided to confess to Randall, even though they barely knew each other, and Petitioner had no reason to trust him. In exchange for his testimony against Petitioner, the State made his assistance known to both State and federal prosecutors in connection with pending sentencings. While no direct promises were made by the prosecutor in this case, Randall knew well how the system works. Providing assistance to the State in someone else's trial results in favorable consideration by the sentencing court and the likelihood of a reduced sentence.

With this scenario in mind, one must take Randall's testimony with a grain of salt. Indeed, there is good reason to reject his testimony as incredible. However, the jury heard his testimony as well as the impeaching evidence against him. The weight, if any, given by the jury to this testimony is, of course, unknown. In any case, there was evidence from which a jury could convict Petitioner, even if Randall's testimony were substantially discounted. Moreover, there is no support for the argument that Randall's testimony was constitutionally infirm.

In assessing Petitioner's claim, the Florida Supreme Court correctly cited the standard for evaluating *Giglio* claims and determined that Petitioner failed to demonstrate that such a violation occurred in his case. Similarly, this Court finds no *Giglio* violation in connection with Randall's

testimony. First, Randall's testimony concerning his pending federal charges was not ostensibly false. Second, defense counsel was aware of, and had access to, the same information as the State's attorney concerning the federal charges pending against Randall. Moreover, even if Randall's testimony concerning his pending federal charges was false, it was immaterial.

Although Randall was no doubt an important witness to the State, Petitioner's trial counsel thoroughly impeached his credibility on cross-examination. The jury was made aware of Randall's extensive criminal history and reputation for informing on fellow inmates. Further, trial counsel attacked Randall's motivation for testifying, focusing on the fact that he was awaiting sentencing on State charges to which he pled guilty in the hopes that his cooperation with law enforcement would aid in a favorable sentence. If the things the members of the jury *already* knew about Randall did not convince them to reject his testimony, it seems unlikely that the knowledge that he was facing additional federal charges would have led them to do so. Accordingly, Petitioner's *Giglio* claim is denied.

### 8.    Claim Ten - IAC During Voir Dire

Petitioner next asserts that trial counsel was ineffective for failing to adequately question eight jurors during voir dire. Petitioner contends that these eight jurors revealed potential bias in responses to questions on their juror questionnaires, and that this potential bias was not adequately addressed by trial counsel. As a result, Petitioner argues that he may not have been tried by an impartial jury.

Petitioner raised this claim in his motion for post-conviction relief. The trial court denied the claim on the basis that it was "speculative in that it assumed different jurors would have come

to a different conclusion, but offers no support for that proposition." (App. D3 at 457-58). On appeal, the Florida Supreme Court affirmed and found:

> The trial record reveals that the trial court, the State, and defense counsel engaged in substantial questioning of the potential jurors. Michael Irwin, codefense counsel for Mansfield, utilized the juror questionnaires throughout voir dire. He asked jurors about contradictory answers in their questionnaires. During the postconviction evidentiary hearing, Mansfield's trial counsel were questioned about jury selection. Counsel were not asked about specific jurors and why questions were or were not asked of specific jurors. However, defense counsel testified at the hearing that they struck the least desirable jurors. Defense counsel Kathleen Flammia testified at the postconviction evidentiary hearing that in this process, she generally employed a strategy during voir dire selection wherein she prioritized which jurors to strike. Trial counsel used all ten of their peremptory challenges. Trial counsel consulted with Mansfield, who gave his own input as to the jurors. Mansfield has not pointed to any instances in which the record demonstrates that counsel did not conduct the voir dire in accord with reasonable professional norms. Our review of the record indicates in the voir dire in this case that trial counsel and the trial court sufficiently questioned the prospective jurors so that it could reasonably be determined that the jurors who were jurors in the trial could lay aside bias and prejudice and render a verdict solely on the evidence and instructions. We find no error in the trial court's denial of this claim. *Griffin v. State*, 866 So. 2d 1, 12-13 (Fla. 2003).

*Mansfield II*, 911 So. 2d at 1172.

The Sixth Amendment guarantees a criminal defendant the right to be tried by an impartial jury, and this right is secured, in no small part, by the system of challenges exercised during the voir dire of prospective jurors. *See United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976) (citing *Swain v. Alabama*, 380 U.S. 202 (1965)); *see also Rogers v. McMullen*, 673 F.2d 1185, 1188 (11th Cir. 1982). "The purpose of voir dire is to ascertain whether potential jurors can render a verdict solely on the basis of evidence presented and the charge of the trial court." *Wilcox v. Ford*, 813 F.2d 1140, 1150 (11th Cir. 1987); *see also J.E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127, 143-44 (1994) ("Voir dire provides a means of discovering actual or implied bias and a firmer basis

upon which the parties may exercise their peremptory challenges intelligently."). Thus, "[v]oir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981); *see also Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991).

"Counsel is . . . accorded particular deference when conducting voir dire. An attorney's actions during voir dire are considered to be matters of trial strategy." *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001) (citing *Nguyen v. Reynolds*, 131 F.3d 1340, 1349 (10th Cir. 1997)); *see also Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995). A petitioner claiming ineffective assistance of counsel during voir dire must show that trial counsel's actions were "so ill chosen that it permeate[d] the entire trial with obvious unfairness." *Hughes*, 258 F.3d at 457. Further, because empaneled jurors are presumed to be impartial, *see Raulerson v. Wainwright*, 753 F.2d 869, 876 (11th Cir. 1985), the petitioner must show that the selection process produced a biased juror to satisfy the prejudice prong of *Strickland*. *Id.* at 458; *see also Ingram v. Zant*, 26 F.3d 1047, 1053 (11th Cir. 1994) ("Because we presume that jurors follow such instructions, we must assume that the jury put aside any biases it may have had, applied the legal standards as enunciated in the jury instructions, and based its sentencing decision on the facts introduced at trial and sentencing.").

Having thoroughly reviewed the record and the voir dire transcript in relation to Jurors Best, Duffield, Etheridge, Hall, Hawes, Mathews, Henley and Santiago, the Court concludes that Petitioner has failed to demonstrate, by clear and convincing evidence, that these empaneled jurors could not be impartial. *See Wilcox*, 813 F.2d at 1150 (noting that federal courts reviewing the question of whether a particular juror is impartial must determine whether there is fair support

in the record for the State court's conclusion that the juror would be impartial). Absent evidence to the contrary, the Court must presume that the jurors were fair and impartial "as indeed they swore to be." *United States v. Khoury*, 901 F.2d 948, 955 (11th Cir. 1990) (footnote omitted). As such, Petitioner cannot show that the State courts' determinations that he failed to satisfy *Strickland* were contrary to, or an unreasonable application of, clearly established federal law or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. Having failed to make the necessary showing, Petitioner is not entitled to relief on this claim.

### 9. Claim Eleven - IAC

#### *a. Failure to Present Theory of Defense Related to Location of Pager*

Petitioner's next claim focuses on the location of his pager at the crime scene and law enforcement's documentation of the crime scene. Petitioner asserts that trial counsel was ineffective for failing to present a "coherent" defense in connection with the location of his pager, which was "allegedly" found at the crime scene. Specifically, Petitioner contends that testimony by law enforcement officers created a false impression that the pager was found near the victim's body.

Petitioner raised this claim in his motion for post-conviction relief. Following an evidentiary hearing, the post-conviction court denied the claim finding that trial counsel was not ineffective because "[w]itnesses were questioned repeatedly about the distance between the victim's body and where the pager was found, the premise being that [Petitioner] had simply dropped the pager near the wall of the Winn Dixie." (App. D3 at 457). Further, the court noted

that all estimates by witnesses ranged between three and twenty feet. Petitioner appealed, and the Florida Supreme Court affirmed, noting:

> [A]t the postconviction evidentiary hearing, Bob Creager, a crime scene technician with the Kissimmee Police Department (KPD), stated that he did record where various evidence was located at the scene and recalled doing measurements, though the information as to exact distances was not in the postconviction evidence. All of the law enforcement officers who testified at the hearing remembered the pager being within twenty feet of the body. Mansfield offered no evidence to support his postconviction contention that the pager was not in the same area as the body. Also, Mansfield has failed to demonstrate what prejudice would have resulted had the jury known that there was no diagram of the crime scene.

*Mansfield II*, 911 So. 2d at 1173.

In determining that this claim lacked merit, the Florida Supreme Court correctly identified and applied the *Strickland* standard. Therefore, this Court may not grant relief unless the State court's decision was contrary to, or involved an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

Upon review, the Court finds that trial counsel's performance was not deficient. Petitioner's trial counsel clearly presented a "coherent" defense surrounding the location of the pager to the victim's body and emphasized that there was no forensic evidence tying the pager to the crime scene, therefore suggesting that there was nothing to tie Petitioner to the crime scene. (App. A44 at 283, 301). Even assuming, *arguendo*, that counsel was deficient, Petitioner has not demonstrated how he was prejudiced because he has not alleged what more trial counsel could have done. Although Petitioner implies that law enforcement placed or some how manipulated the location of his pager so as to implicate him, the Court finds this theory to be unsupported by the record. Numerous law enforcement officers testified at trial that, based on their observations and

-32-

recollection, the pager was found near the victim's body. Despite the range in estimates, it is unlikely that the outcome of the trial would have been different had the jury known the exact distance. Accordingly, this claim is denied.

      *b.     Failure to Present Theory of Defense Which Implicated William Finneran*

      Other than Petitioner, William Finneran was the only person who was seen with Sara Robles just prior to her death. Finneran accompanied Mansfield and Robles as they left Rosie's Bar shortly after 2 a.m. and Finneran admitted that he last saw Mansfield and Robles at the Winn-Dixie around 3:00 a.m. – the approximate time of the murder. At trial, however, Finneran claimed to have made a collect telephone call to a friend, Charles Sturdevant, at approximately 2:45 a.m. or 3:00 a.m. from a payphone at the Farm Store located a few blocks from the Winn-Dixie. Subsequent testimony elicited by defense counsel, however, established that this phone call actually took place at 3:15 a.m. While other phone records established that Finneran had also made a series of calls to Denmark from his home beginning around 3:47 a.m., Finneran clearly did not have an alibi for the time of the murder. In addition to his lack of alibi, Finneran testified that Robles had scratched his arm the morning of her murder. According to Finneran, however, he had provided DNA samples to law enforcement. These DNA samples were never analyzed by law enforcement or compared to Robles' DNA prior to trial.

      Based on the foregoing, Petitioner contends that his counsel was ineffective in developing a coherent defense theory which implicated Finneran. Specifically, Petitioner contends that his

counsel was ineffective in impeaching Finneran concerning his alibi and by failing to highlight to the jury that Finneran's DNA had never been tested.[8]

Petitioner raised these claims in his motion for post-conviction relief and the post-conviction trial court denied relief. In considering counsel's failure to impeach Finneran's putative alibi, the trial court found that Finneran did not use his calls to Denmark as an alibi during trial. The trial court, however, did not address the apparent discrepancy between the time Finneran recalled making the call to Charles Sturdevant from the Farm Store (i.e., 2:45 a.m. or 3:00 a.m.) and subsequent trial testimony from another witness which established that this call actually took place at 3:15 a.m. In considering counsel's failure to highlight the fact that Finneran's DNA had never been tested or compared, the post-conviction trial court concluded that this was a strategic decision by the defense. "Had Finneran's DNA been tested and found not to match any at the crime scene, the suggestion of reasonable doubt, raised by Finneran's having been in the company of the victim on the night she was murdered, would have been erased." (App. D3 at 17). Thus, despite the fact that Finneran's DNA was still available for testing prior to the post-conviction evidentiary hearing, the post-conviction trial court concluded that defense counsel's decision not to test the DNA was a strategic decision.

On collateral appeal, the Florida Supreme Court agreed with the trial court. With respect to Finneran's alibi, the Florida Supreme Court concluded that any discrepancies "in Finneran's

---

[8] Petitioner also contends that his counsel was ineffective by failing to object to Finneran's testimony concerning a polygraph and in failing to object to Finneran's testimony concerning Mansfield's apparent willingness to fight an elderly stroke victim – the owner of Rosie's Bar – hours before the murder. However, because Petitioner failed to raise these claims on direct appeal or on State collateral review, these claims are clearly barred.

testimony as to the time [the calls from the Farm Store and Denmark were made] were highlighted by the defense both before and after Finneran's testimony." *Mansfield II*, 911 So. 2d at 1173. Furthermore, it was "clear from the testimony at trial that "[Finneran] was in the vicinity of the crime scene at the time the killing occurred." *Id*. at 1174. With respect to the fact that Finneran's DNA evidence had never been tested or compared, the Florida Supreme Court relied on the lower court's findings and found that "Mansfield never sought to have Finneran's DNA tested for purposes of the post-conviction proceedings [even though it was available for such testing]." *Id*. at 1173. Accordingly, the Florida Supreme Court found no error in the trial court's denial of Mansfield's ineffective assistance of counsel claims concerning Finneran. *Id*. at 1174.

Upon review, Petitioner has failed to establish that his counsel's performance was deficient. Petitioner's counsel clearly established that Finneran did not have an alibi for the time of the murder and that Finneran was within close proximity to the victim on the night of the murder. As to Finneran's testimony concerning his DNA, the Court agrees with the conclusion reached by the State courts. Inasmuch as Finneran's DNA was available for testing prior to the post-conviction evidentiary hearing, defense counsel's decision not to have the DNA tested should be regarded as a strategic choice – not as deficient performance. To the extent counsel failed to implicate Finneran in her closing argument to the jury, that claim is addressed, *infra*. Accordingly, the Court concludes that Petitioner is not entitled to relief on this claim.

    *c.    Failure to Cross-Examine Christopher Randall on Pending Federal Charges*

Petitioner next asserts that trial counsel rendered ineffective assistance by failing to cross-examine Christopher Randall about his pending federal charges in the Middle District of Florida. Petitioner raised this claim in his motion for post-conviction relief, and the post-conviction court

denied the claim, finding that Petitioner could not demonstrate how the outcome of his trial would have been different had these charges been presented to the jury. (App. D3 at 459). In making this determination, the court considered the fact that trial counsel thoroughly questioned Randall about his extensive criminal history, which included both state and federal convictions, and the fact that he had testified against numerous fellow prisoners in the past. (App. D3 at 459). On appeal, the Florida Supreme Court agreed with the trial court. *Mansfield II*, 911 So. 2d at 1174.

"As a general rule, pending charges are relevant to show pro-government bias on the part of the testifying witness, on the theory that the witness might tailor his testimony to please the prosecutor, in exchange for a promise of leniency on the pending charges." *Stephens v. Hall*, 294 F.3d 210, 224 (1st Cir. 2002). In order to show that counsel was ineffective for failing to cross-examine Randall on the pending federal charges, Petitioner must demonstrate both that counsel's performance was deficient in that it "fell below an objective standard of reasonableness," and that counsel's deficient performance prejudiced the defense. *See Strickland*, 466 U.S. at 687-88.

Notwithstanding the performance prong, Petitioner has not met the prejudice prong. As previously discussed, *see* Part IV-A, 7, *supra*, trial counsel cross-examined Randall on various issues relating to his credibility – prior criminal history, motives for testifying, and his track record for informing on fellow inmates regarding their jailhouse confessions. As such, the jury heard a significant amount of evidence that cast doubt upon Randall's credibility. Moreover, it is debatable whether trial counsel would have been able to parlay the pending federal charges into a strong showing of bias because the prosecutor had already informed the jury that Randall was due to be sentenced in another case and that he was hoping the State would advise the sentencing judge about his cooperation with law enforcement in Petitioner's case. Therefore, Randall's bias and

motive for testifying were already made known to the jury, and Petitioner cannot demonstrate prejudice. The Court therefore concludes that Petitioner is not entitled to relief on this claim.

### d. Failure to Give Adequate Closing Argument

Petitioner next claims that trial counsel was ineffective during closing argument. Specifically, trial counsel made a brief closing argument with the expectation that she would have another opportunity to speak following the State's closing argument. However, the State chose to rest without making a closing argument, thereby foreclosing the possibility of any rebuttal.

Petitioner raised this claim in his motion for post-conviction relief and the post-conviction court denied relief finding that the brief initial closing argument was part of trial counsel's strategy. (App. D3 at 462-63). The Florida Supreme Court affirmed on appeal. *Mansfield II*, 911 So. 2d at 1174.

Under the circumstances, trial counsel's decision was a question of tactics, which is accorded substantial deference on habeas review. As the Eleventh Circuit has noted:

> The Supreme Court has mandated a highly deferential review of counsel's conduct, especially where strategy is involved. Intensive scrutiny and second-guessing of attorney performance are not permitted. Because it is a wide range of performance that is constitutionally acceptable, the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between. Cases in which deliberate strategic decisions have been found to constitute ineffective assistance are even fewer and farther between.

*Spaziano v. Singletary*, 36 F.3d 1028, 1039 (11th Cir. 1994) (citations and quotations omitted).

Petitioner has not shown how he was prejudiced by trial counsel's strategy, particularly in light of the fact that the State did not make a closing argument, thereby giving the defense the "last word." The record reveals that trial counsel put forth a vigorous defense, and in her brief closing argument she "told the jury that there was not enough evidence to erase the reasonable doubt that

[Petitioner] killed Robles, particularly given that the two star witnesses, Finneran and Randall, had much to gain by testifying." *Mansfield II*, 911 So. 2d at 1174. While it appears in hindsight that a different course might have been preferable, counsel's strategy was neither unreasonable nor deficient. *Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."); *see also Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983). Accordingly, this claim is denied.

### 10. Claim Twelve - IAAC For Failure to Challenge Notice of Felony Murder and Unanimity of Jury Verdict

Petitioner's indictment charged him with premeditated first degree murder. (App. A1 at 15). Petitioner asserts that he was deprived of adequate notice that the State would be seeking to prove felony murder – specifically, that the murder occurred during the course of a sexual battery – because Petitioner's indictment charged him with premeditated first degree murder and did not mention felony murder. Additionally, because he was not charged with sexual battery, Petitioner asserts it was reasonable to believe the State was not trying to prove felony murder, and therefore, assuming any member of the jury arrived at a conviction under that theory, his right to due process and a fair trial were violated. As such, Petitioner maintains that the general verdict form that was used by the jury violated his right to a unanimous jury verdict because there is no proof that all twelve jurors found premeditation.

Prior to trial, counsel for Petitioner attempted to prevent the State from pursuing a theory of felony murder, (Apps. A3 at 496-97; A40 at 32), and the trial court denied the request. At the

conclusion of all the evidence, the trial judge gave detailed instructions on both premeditated

murder and felony murder, as separate and distinct theories, and the jury returned a unanimous

general verdict of first degree murder.

In his State habeas petition, Petitioner argued that his appellate counsel rendered

ineffective assistance by failing to challenge the jury instructions that allowed the jury to find

Petitioner guilty of first degree murder if he was found guilty of either felony or premeditated

murder. In denying relief, the Florida Supreme Court stated:

> This Court and the United States Supreme Court have repeatedly rejected relief on
> this issue. In *Schad v. Arizona*, 501 U.S. 624, 645 (1991), the Supreme Court held
> that the United States Constitution did not require the jury to come to a unanimous
> decision on the theory of first-degree murder and that separate verdict forms for
> felony and premeditated murder were not required. "It is well established that an
> indictment which charges premeditated murder permits the State to prosecute under
> both the premeditated and felony murder theories." *Parker v. State*, 904 So. 2d
> 370, 382 (Fla. 2005). Furthermore "because the State has no obligation to charge
> felony murder in the indictment, it similarly has no obligation to give notice of the
> underlying felonies that it will rely upon to prove felony murder." *Kearse v. State*,
> 662 So. 2d 677, 682 (Fla. 1995). Mansfield's appellate counsel was not ineffective
> for failing to raise a claim which we have repeatedly rejected. *Floyd v. State*, 808
> So. 2d 175, 185 (Fla. 2002). To the extent that Mansfield raises a substantive claim
> on this issue, this claim is without merit under this prior case law.

*Mansfield II*, 911 So. 2d at 1178-79.

The Court finds that the Florida Supreme Court did not act contrary to clearly established

federal law, or apply federal law in an objectively unreasonable way. The United States Supreme

Court has held that a general verdict which fails to differentiate between premeditated and felony

murder is not constitutionally inadequate and does not violate a defendant's due process rights.

*Schad v. Arizona*, 501 U.S. 624, 644-45 (1991); *see also Sims v. Singletary*, 155 F.3d 1297, 1313

(11th Cir. 1998) (finding that jury need not agree on the precise theory of first degree murder, only

the offense itself). It is only where a conviction on a general verdict could have been based on two separate grounds and one of those grounds is unconstitutional, *see Stromberg v. California*, 283 U.S. 359 (1931), or legally inadequate, *see Yates v. Untied States*, 354 U.S. 298 (1957), that due process could potentially be violated. *See Clark v. Crosby*, 335 F.3d 1303, 1308-10 (11th Cir. 2003). A conviction under a theory of felony murder was neither unconstitutional nor legally inadequate in the instant case.

Furthermore, the Florida Supreme Court's factual findings demonstrate ample evidence of both felony murder and premeditated murder beyond a reasonable doubt. These factual determinations must be accorded deference, and Petitioner has not provided clear and convincing evidence to the contrary. In any event, the Court concludes that the jury could have found beyond a reasonable doubt that Petitioner committed murder during the course of a sexual battery. The record thus supports both felony murder and premeditated murder jury instructions and the jury's general verdict under either theory. Accordingly, Petitioner's appellate counsel was not ineffective for failing to raise any claim related to these matters on direct appeal.

11. **Claim Thirteen - *Ring* and *Apprendi* Violation**

Petitioner raises two issues in claim thirteen. First, Petitioner asserts that Florida's death penalty statute, as applied to him, violates the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution pursuant to *Ring v. Arizona*, 536 U.S. 584 (2002) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Second, Petitioner alleges that his appellate counsel was ineffective for failing to present this issue on appeal.

On June 26, 2000, the United States Supreme Court issued its ruling in *Apprendi*, holding that the Sixth Amendment prohibits judges from enhancing criminal sentences beyond statutory

maximums based on facts other than those decided by the jury beyond a reasonable doubt. 530

U.S. 466 (2000). Two years later, the Supreme Court issued its ruling in *Ring* and held that "a

sentencing judge, sitting without a jury, [may not] find an aggravating circumstance [which is]

necessary for imposition of the death penalty." *Ring*, 536 U.S. at 609. Instead, "the Sixth

Amendment requires that [aggravating circumstances] be found by a jury." *Id.* In so ruling, the

Supreme Court extended its holding in *Apprendi* to capital cases, concluding that "[c]apital

defendants, no less than non-capital defendants . . . are entitled to a jury determination of any fact

on which the legislature conditions an increase in their maximum punishment." *Ring*, 536 U.S. at

589.

Petitioner raised the claim of ineffective assistance of appellate counsel in his State petition

for habeas relief, and the Florida Supreme Court denied relief. *See Mansfield II*, 911 So. 2d at

1180. Because the United States Supreme Court issued its ruling in *Ring* after the Florida

Supreme Court affirmed Petitioner's conviction and sentence on appeal, and *Ring* is not

retroactive, the Florida Supreme Court held counsel could not be deemed ineffective for failing to

anticipate the change in the law. *Id.*

Petitioner's reliance on *Ring* is misplaced. First, Petitioner's *Ring* claim is barred by the

non-retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288 (1989). *See Turner v. Crosby*, 339

F.3d 1247 (11th Cir. 2003) (applying *Teague* bar to *Ring* claim and finding that *Ring* does not

apply retroactively). Second, and notwithstanding Petitioner's attempt to circumvent *Ring*'s non-

retroactivity by arguing that his case should be governed by *Apprendi*,[9] Petitioner cannot

---

[9] The Florida Supreme Court affirmed Petitioner's conviction and death sentence on March
30, 2000. Petitioner filed a petition for writ of certiorari with the United States Supreme Court on

demonstrate that an *Apprendi/Ring* violation occurred. While *Ring* makes *Apprendi* applicable to death penalty cases, the Florida Supreme Court has expressly recognized that the maximum penalty for first degree murder under Florida's statutory scheme is death. *See Porter v. Crosby*, 840 So. 2d 981, 986 (Fla. 2003); *Shere v. Moore*, 830 So. 2d 56, 61 (Fla. 2002) ("This court has defined a capital felony to be one where the maximum possible punishment is death."); *Mills v. Moore*, 786 So. 2d 532, 536-68 (Fla. 2001). As such, the Florida Supreme Court has rejected numerous *Ring* challenges, consistently finding that Florida's sentencing scheme comports with the Sixth Amendment. *See Bottoson v. Moore*, 833 So. 2d 693 (Fla. 2002); *King v. Moore*, 831 So. 2d 143 (Fla. 2002); *Kormondy v. State*, 845 So. 2d 41, 54 (Fla. 2003) (*Ring* does not encompass Florida procedures or require either notice of the aggravating factors that the State will present at sentencing or a special verdict form indicating the aggravating factors found by the jury). Because neither *Apprendi* nor *Ring* requires a finding that the Florida capital sentencing scheme is unconstitutional, Petitioner has failed to raise a federal constitutional violation. *See Hannon v. Dep't of Corr.*, No. 8:06-CV-2200, 2007 WL 3119632, at *51-52 (M.D. Fla. Oct. 23, 2007). Accordingly, this claim is denied.

**B.    Claim One - The *Miranda* Issue**

The Florida Supreme Court found that a reasonable person in Mansfield's position during his questioning at the police station would have considered himself to be in custody. *Mansfield I* at 644. Therefore, pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694

June 28, 2000, two days after the Supreme Court issued its ruling in *Apprendi*, and the petition was denied by the United States Supreme Court on April 23, 2001. Because his conviction and sentence became final with the denial of his petition, which occurred after the Court's ruling in *Apprendi*, Petitioner argues that the holding in *Apprendi* applies to him.

(1966), the police were obligated to inform Petitioner of his rights before interrogating him, and their failure to do so should have led to the suppression of the videotape of that interrogation. *Id.* However, the Florida Supreme Court concluded that the trial court's denial of Mansfield's motion to suppress the videotape, though erroneous, was harmless. *Id.* at 644-45.

Petitioner claims that the Florida Supreme Court erred when it found that the trial court's admission of his videotaped interrogation was a harmless error, and the Florida Supreme Court's mistake was made in a manner that justifies habeas relief under the AEDPA. Despite a great deal of development in recent years, this area of the law – *i.e.*, the intersection between harmless error review and the AEDPA – remains somewhat murky. Therefore, before assessing this claim, the Court will review the guiding legal principles in somewhat greater detail than normal.

*1.    Harmless Error*

The starting point for any analysis of the harmlessness of an error committed during a criminal trial is the federal harmless error statute, 28 U.S.C. § 2111, which provides that

> On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties.

Similar harmless error provisions are found at FED. R. CRIM. P. 52(a)[10] and FED. R. CIV. P. 61.[11] These provisions grew out of concerns that appellate courts were elevating form over substance in

---

[10]Rule 52(a) provides that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."

[11]Rule 61 provides in pertinent part that "[a]t every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."

many cases, particularly criminal cases, overturning verdicts on the basis of inconsequential

mistakes committed during the trial.[12]  So-called harmless error rules are intended

> to substitute judgment for automatic application of rules; to preserve review as a
> check upon arbitrary action and essential unfairness at trials, but at the same time
> to make the process perform that function without giving men fairly convicted the
> multiplicity of loopholes which any highly rigid and minutely detailed scheme of
> errors, especially in relation to procedure, will engender and reflect in a printed
> record.

*Kotteakos v. United States*, 328 U.S. 750, 760, 66 S.Ct. 1239, 1245, 90 L.Ed. 1557 (1946)

(interpreting predecessor to current harmless error statute).

> 2. *Kotteakos*

In *Kotteakos*, the United States Supreme Court interpreted the then-existing harmless error

statute, 28 U.S.C. § 391.[13]  The *Kotteakos* Court held that, in assessing the harmlessness of an

error committed during a criminal trial, reviewing courts must analyze "what effect the error had

or reasonably may be taken to have had upon the jury's decision." *Id.* at 764, 66 S.Ct. at 1247.  If,

after weighing the error's effect against the entire record, "the conviction is sure that the error did

not influence the jury, or had but very slight effect, the verdict and the judgment should stand." *Id.*

at 764, 66 S.Ct. at 1248.

> But if one cannot say, with fair assurance, after pondering all that happened without
> stripping the erroneous action from the whole, that the judgment was not
> substantially swayed by the error, it is impossible to conclude that substantial rights
> were not affected.  The inquiry cannot be merely whether there was enough to

---

[12]In the words of one trial judge, the courts of appeal "tower[ed] above the trials of criminal cases as impregnable citadels of technicality."  Hon. Marcus A. Kavanagh, *Improvement of Administration of Criminal Justice by Exercise of Judicial Power*, 11 A.B.A.J. 217, 222 (1925).

[13]FED. R. CRIM. P. 52(a) and FED. R. CIV. P. 61 also trace their "lineage" back to 28 U.S.C. § 391.  *See O'Neal v. McAninch*, 513 U.S. 432, 441, 115 S.Ct. 992, 997, 130 L.Ed.2d 947 (1995).

support the result, apart from the phase affected by the error. It is rather, even so, whether the error had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Id.* at 765, 66 S.Ct. at 1248.

In *Kotteakos*, although the defendants had been charged with (and were convicted of) participation in a single general conspiracy to defraud, the evidence proved that the defendants had taken part in eight or more separate conspiracies executed through a common key figure. *Id.* at 752, 66 S.Ct. at 1241. That key figure participated in each conspiracy, but most of the other conspirators had no connection with one another or the other fraudulent transactions. *Id.* at 754, 66 S.Ct. at 1243.

The *Kotteakos* Court noted that the failure to charge the defendants with participation in separate conspiracies "permeated the entire charge, indeed the entire trial," allowing the jury to convict participants in one conspiracy on the basis of evidence from another and eliminating the government's need to prove the occurrence of separate overt acts for each conspiracy, among other problems. *Id.* at 770, 66 S.Ct. at 1250. Although the court of appeals found that the evidence of each individual defendant's participation in at least one conspiracy to defraud was clear, the Supreme Court reversed the convictions, finding it "highly probable" that the charging error "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 776, 66 S.Ct. at 1253.

3. *Chapman*

The *Kotteakos* Court left open the question of whether a different standard would apply where the trial court was alleged to have committed, not merely an error, but a violation of the United States Constitution. That question was answered in *Chapman v. California*, 386 U.S. 18,

87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In *Chapman*, the prosecutor had referred repeatedly and negatively to the defendants' failure to testify in their defense, a line of argument that was permissible under the California constitution but which was found, shortly after the trial, to violate the Fifth Amendment to the United States Constitution. *Id.* at 19, 87 S.Ct. at 825. Relying on its previous harmless error decisions, the *Chapman* Court rejected the proposition that any such violation necessarily required reversal. *Id.* at 22, 87 S.Ct. at 827.[14] The Court also considered and rejected California's harmless-error rule, which focused on whether a "miscarriage of justice" had occurred. *Id.* at 23, 87 S.Ct. at 827.

> We prefer the approach of the Court in deciding what was harmless error in our recent case of *Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). There we said: "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.* at 86-87, 84 S.Ct. at 230. . . . There is little, if any, difference between our statement in *Fahy* . . . about "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction" and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. We, therefore, do no more than adhere to the meaning of our *Fahy* case when we hold, as we now do, that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.[15]

---

[14]The Court also noted that the federal harmless error statute did not distinguish between constitutional, statutory, or other types of error. *Id.*

[15]In applying *Chapman*, a number of courts quote only this last sentence, or describe the applicable standard as "*Chapman*'s harmless-beyond-a-reasonable-doubt standard". This suggests that the *Chapman* standard is different in *kind* from the *Kotteakos* standard, rather than simply imposing a greater burden on the government. However, this passage makes it clear that the *Chapman* standard maintains the same essential character as the *Kotteakos* standard, assessing harmlessness by focusing on the error's effect on the verdict. *Accord, Yates v. Evatt*, 500 U.S. 391, 402-03, 111 S.Ct. 1884, 1892 (1991) ("The *Chapman* test is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.") (internal quotation omitted), *reversed on other grounds, Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

*Id.* at 23-24, 87 S.Ct. at 827-28.

    *4.    Brecht*

    Chapman had made its way to the Supreme Court on direct review. In *Brecht v.*

*Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the Supreme Court revisited

the constitutional-error issue in the context of a collateral review of a State-court criminal

judgment under 28 U.S.C. § 2254. The *Brecht* Court determined that, when considering the

harmlessness of constitutional errors occurring during State court trials, considerations of finality,

comity, and federalism warranted a "less onerous" harmless error standard than the one set forth in

*Chapman*:

> The *Kotteakos* standard, we believe, fills the bill. The test under *Kotteakos* is
> whether the error "had substantial and injurious effect or influence in determining
> the jury's verdict." Under this standard, habeas petitioners may obtain plenary
> review of their constitutional claims, but they are not entitled to habeas relief based
> on trial error unless they can establish that it resulted in "actual prejudice." The
> *Kotteakos* standard is thus better tailored to the nature and purpose of collateral
> review and more likely to promote the considerations underlying our recent habeas
> cases.

*Brecht* at 619, 113 S.Ct. at 1710. Although the language in this passage suggests that habeas

petitioners bear the burden of establishing that the error affected their verdict, the Supreme Court

has made it clear that any uncertainty as to the harmlessness of an error must be resolved in favor

of the petitioner.

> [W]e consider here the legal rule that governs the special circumstance in which
> record review leaves the conscientious judge in grave doubt about the likely effect of
> an error on the jury's verdict. (By "grave doubt" we mean that, in the judge's mind,
> the matter is so evenly balanced that he feels himself in virtual equipoise as to the
> harmlessness of the error.) We conclude that the uncertain judge should treat the
> error, not as if it were harmless, but as if it affected the verdict (*i.e.*, as if it had a
> "substantial and injurious effect or influence in determining the jury's verdict").

*O'Neal v. McAninch*, 513 U.S. at 435, 115 S.Ct. at 994, 130 L.Ed.2d 947 (1995).

Thus, after *Brecht*, where it was alleged that a trial court had committed a constitutional error, reviewing courts are required to apply one of two different harmless error standards, depending on the nature of the proceedings. On direct appeals, the *Chapman* standard applies; on federal collateral review, courts apply the "less onerous" *Kotteakos* standard (usually referred to, post-*Brecht*, as the *Brecht* standard). *Fry v. Pliler*, 551 U.S. 112, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007). Although expressed in different language, the standards share the same essence, requiring the reviewing court to determine whether the error complained of had a substantial effect on the verdict. Under *Chapman*, the court must be sure beyond a reasonable doubt that the error did not affect the verdict, while under *Brecht*, the court must have a "fair assurance" that the verdict is untainted. *Brecht* at 619, 113 S.Ct. at 1717-18 (stating that, under *Chapman*, the "state bears the burden of proving that an error passes muster" under the harmless-beyond-a-reasonable doubt standard) *and Kotteakos* at 765, 66 S.Ct. at 1239 (stating that conviction should be overturned unless "one can say, with fair assurance ... that the judgment was not substantially swayed by the error.").

When assessing harmlessness, the reviewing court is obligated to consider what effect, if any, the error had upon the guilty verdict obtained in the case before it, rather than trying to guess whether the same verdict would have been rendered in a trial that occurred without the error. Hypothesizing a guilty verdict that was never in fact rendered would violate the Sixth Amendment's jury-trial guarantee. *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081-82, 124 L.Ed.2d 182 (1993).

    *5.*    *AEDPA*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-32, 110 Stat. 1214 (1996), added an additional prerequisite to the granting of habeas relief by the federal courts. Pursuant to 28 U.S.C. § 2254(d), a federal court may not grant an application for a writ of habeas corpus with respect to any claim adjudicated on the merits by a State court unless the State court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

As announced by the Supreme Court, a decision can be "contrary to" clearly established Federal law for purposes of 28 U.S.C. § 2254 "if the state court applies a rule that contradicts the governing law set forth in our cases"[16] or if the state court "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Williams v. Taylor*, 529 U.S. 362, 406, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000). "A state court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would qualify as a decision 'involv[ing] an unreasonable application of ... clearly established Federal law.'" *Id.* at 407-08, 120 S.Ct. at 1520. To resolve the "unreasonable application" inquiry, the federal habeas court should ask whether the State court's application of clearly established federal law was

---

[16]An example of such a contradictory rule would be if a State court rejected a prisoner's ineffective-assistance-of-counsel argument on the grounds that he had failed to establish by a preponderance of the evidence that the result of his criminal proceeding would be different whereas, under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the prisoner need only demonstrate a reasonable probability that the result would have been different. *Williams*, 529 U.S. at 406, 120 S.Ct. at 1519.

"objectively unreasonable." *Id.* at 409, 120 S.Ct. at 1521. Although difficult to define, an objectively unreasonable application of clearly established federal law is something other than merely an incorrect or erroneous application of federal law. *Id.* at 412, 120 S.Ct. at 1523.

### 6.    *Brecht after AEDPA*

Since passage of AEDPA, the Circuit Courts have been split as to the continued viability of the *Brecht* standard and its integration with AEDPA when assessing the harmlessness (or lack thereof) of errors occurring during state court proceedings. *See, e.g.,* Jeffrey S. Jacobi, *Mostly Harmless: An Analysis of Post AEDPA Federal Habeas Corpus Review of State Harmless Error Determinations,* 105 MICH. L. REV. 805 (2007). The United States Court of Appeals for the Eleventh Circuit addressed this topic when handing down its opinion *Wellons v. Hall,* 2009 WL 17933 (11th Cir. Jan 5, 2009). *Wellons* was a case in which the trial court, relying on the case of *Sabel v. State,* 282 S.E.2d 61 (Ga. 1981), violated a criminal defendant's federal due process rights by providing greater discovery rights to the State than to the defense. After recounting the history of harmless error review in federal habeas proceedings and assessing the impact of AEDPA on such review, the *Wellons* court concluded, based on *Fry v. Pliler,* 551 U.S. 112, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007), that the *Brecht* standard survived the adoption of the AEDPA. The court then stated that

> Because the Georgia Supreme Court found the *Sabel* error harmless, Wellons will be entitled to receive habeas relief only if the Georgia Supreme Court's harmless error determination was objectively unreasonable in light of clearly established law, viz., *Brecht.*

*Id.* at *16. The *Wellons* Court then examined the Georgia Supreme Court's assessment of the harmlessness of the error, found that it followed the course of the "substantial and injurious effect"

analysis described in *Brecht*, and denied habeas relief because "the Georgia Supreme Court's harmless error analysis was not contrary to, or an unreasonable application of *Brecht*." *Id.* at *16.

This Court is unable to reconcile the analytical format utilized in *Wellons* with existing Supreme Court precedent, which requires State courts to comport with *Chapman* – not *Brecht*. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003) (reversing Sixth Circuit Court of Appeals for its failure to consider, under AEDPA, whether State court was objectively unreasonable in applying *Chapman* standard). It is the federal court that is commanded to apply *Brecht* to assess the harmlessness of a constitutional error on habeas review of a State court conviction, presumably (but not necessarily) after it examines the State court's harmlessness assessment pursuant to AEDPA, determining whether that assessment was done in a manner that was contrary to or an unreasonable application of *Chapman*.[17] *Brecht* itself announces that State courts are required to follow the *Chapman* standard. *Brecht* at 636, 113 S.Ct. at 1721 ("For these reasons, it scarcely seems logical to require federal habeas courts to engage in the identical approach to harmless-error review that *Chapman* requires state courts to engage in on direct review."). Indeed, the rationale for the adoption of the "less onerous" *Brecht* standard for federal habeas review goes out the window unless State courts are applying the more onerous *Chapman* standard on direct appeal.

---

[17]*See, e.g., Penry v. Johnson*, 532 U.S. 782, 121 S.Ct. 1910 (2001) (finding that AEDPA prohibited issuance of writ because State court's conclusion that admission of old psychiatric report was permissible was not contrary to or an unreasonable application of *Estelle v. Smith*, 451 U.S. 454, 121 S.Ct. 1910, 150 L.Ed.2d 9 (1981), and adding, in dicta, that even if AEDPA assessment had come out the other way, writ could not issue unless defendant could also satisfy *Brecht* harmless-error standard). *See also Fry v. Pliler*, 551 U.S. 112, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007) (holding that on habeas review federal court must apply *Brecht* harmless-error standard even where State court has failed to apply *Chapman* standard).

This Court will therefore consider first whether the Florida Supreme Court's harmlessness determination was an objectively reasonable application of *Chapman* under AEDPA and, if not, this Court will consider the prejudicial impact of the error under *Brecht*'s more deferential standard of review.

## 7.   Analysis Under AEDPA

The Florida Supreme Court agreed with Mansfield's argument that, because he was not

warned of his *Miranda* rights, his videotaped interrogation on October 15, 1995 should not have

been admitted into evidence. *Mansfield I*, 758 So. 2d at 642-44. Turning to harmless-error

review, the court articulated the proper standard, stating that "[e]rror is harmless if the reviewing

court can say *beyond a reasonable doubt that the error did not affect the verdict*." *Id.* at 644

(emphasis added).[18]  The court compared the case before it to the case of *Alvord v. Dugger*

("*Alvord II*"), 541 So. 2d 598 (Fla. 1989), which also involved the admission of a statement by a

defendant who had not been properly advised of his *Miranda* rights. The *Alvord II* Court had

found that the erroneously admitted statement was not the "centerpiece" of the State's case.

> Specifically, in *Alvord*, the defendant's girlfriend testified to a conversation with the
> defendant in which the defendant confessed to the crime. The State also presented
> evidence demonstrating that the defendant harbored a dislike for the victim and had
> some of the victim's jewelry in his possession after the murder, and that some
> physical evidence matched that found at the murder scene. The evidence presented in
> the instant case is similar and arguably stronger. In the instant case the State, in
> addition to the significant circumstantial evidence placing the defendant at the crime
> scene with the victim near the time the murder is presumed to have occurred,
> presented the testimony of Michael Johns, who recounted a jailhouse confession by
> Mansfield. Additionally, the testimony tended to show that the food stamps found in
> Mansfield's room the day after the murder belonged to Robles. Further, the State's
> medical examiner testified as to the existence of a pattern injury on Robles' neck
> matching the distinctive pattern found on the ring recovered from Mansfield during
> his arrest.

---

[18]While the *Mansfield I* Court did not cite to *Chapman* specifically, AEDPA does not require
that a State court cite to the pertinent Supreme Court cases, or even be aware of them, so long as
neither the reasoning nor the result contradicts them. *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362,
364, 154 L.Ed.2d 253 (2002).

*Mansfield I* at 645. Without further comment, the *Mansfield I* Court implicitly determined that the erroneously admitted videotape was not the centerpiece of the State's case and its admission was therefore harmless error.

The situation in the *Alvord* case was markedly different than the situation in this case, however. Mansfield was said to have bragged about the murder to a jailhouse snitch, Christopher Randall, a/k/a Michael Johns. Randall, whose fantastic record of extracting confessions from his cell mates is discussed, *supra*, obviously had a motive to fabricate Mansfield's alleged admission. Mansfield's alleged confession occurred months after the murder (and accompanying news reports). So far as the record shows, there was no information in Mansfield's alleged confession that was unknown to the general public by that time – just a vulgar description of the knife wounds inflicted on the victim, a statement that Mansfield went swimming to destroy any DNA evidence that might have been on his body or his clothes, and a claim that he had not left any DNA at the scene of Robles' murder for the police to trace.

Contrast this with the situation in *Alvord*. Alvord was accused of strangling three women while burglarizing their home: Ann Herrman, Lynn Herrman, and Georgia Tully (who was the mother of Ann Herrman). *Alvord I.* at 535. Each victim's body was found in a separate room. *Alvord I* at 535.

> [The] Defendant's girl friend testified that on the evening after defendant had committed the murder, he stated to her, "I had to rub out three people last night, Zelma," and in response to her question as to whom: "Ann, Lynn and her Mom." Defendant told her he had strangled them after placing them in separate rooms. Defendant told his girl friend that he could not shoot them because it would make too much noise, and that was why he had to strangle them.

*Alvord I* at 539-40. Alvord's girlfriend also testified that he told her he entered the home after kicking the door in, which matched the evidence at the crime scene. *Alvord II* at 600.

There is nothing in either of the *Alvord* opinions to suggest that the defendant's girlfriend had a motive to fabricate her testimony, which the *Alvord II* court described as "the principal part of the state's case." *Id.* With all this in mind, while the jury certainly was not required to disbelieve Randall's testimony in this case, the average juror would likely find it far less credible than the girlfriend's testimony in *Alvord*, and it certainly was not the principal part of the State's case against Mansfield.

In addition to favorably comparing the alleged confessions in the two cases, the *Mansfield I* Court also found that the physical evidence linking Mansfield to the crime was as strong or stronger than the comparable evidence in *Alvord*. In *Alvord*, the State introduced evidence suggesting that, at the time of her death, Ann Herrman owned a blue cigarette lighter with gold trim, a wedding ring with a pear-shaped diamond, an engagement ring that had a diamond in the center surrounded by smaller diamonds, and a gold watch with diamonds and a stretch band.. *Alvord II* at 600-01. None of the items could be located after Ann Herrman's death. *Id.* at 601. Alvord's girlfriend testified that, after the murders, Alvord had a gold and purple cigarette lighter, a pear-shaped diamond ring, a ring with diamonds set in a flowered design, and a woman's watch with a stretch band. *Id.* at 601. Another witness testified that she saw Alvord, after the murders, in possession of a woman's diamond watch with a stretch band. *Id.*

By contrast, in *Mansfield I*, food stamps were found in Mansfield's room the day after the murder.[19] *Mansfield I* at 645. According to the *Mansfield I* court, "the testimony tended to show" that those stamps belonged to Robles. *Id.* This overstates the case. The evidence established that Robles received $576 in food stamps five days before she died and was in possession of some when she was killed.[20] Mansfield was staying with his brother, Charles, and his brother's girlfriend in their apartment. Charles Mansfield testified that the food stamps were found in a drawer in his computer room, where Mansfield often slept on the floor, and the State presented evidence that none of the adults staying in the apartment had been issued food stamps.

However, everyone staying in the apartment accessed the computer room, which was used for storage. Charles Mansfield also testified that he had known his brother to use food stamps in the past, prior to Robles' death, even though he had not received them from the State.[21] Unlike the jewelry at issue in *Alvord*, no serial numbers or other identifying marks could be used to link the stamps found in the computer room to the stamps Robles possessed when she was murdered.[22] At the close of the evidence, the trial judge told the lawyers that "I'm not too sure at this time and

---

[19]In her opening statement, defnse counsel said that less than $15 in food stamps were found in the computer room.

[20]Robles' friend, Jesus Alfonso, testified that Robles told him she had no cash, only food stamps, on the night of her death, and the cashier at the Winn-Dixie that night testified that Robles paid for her purchases with food stamps only. Detective Warren Shephard testified that a few dollars' worth of food stamps were found near Robles' body.

[21]Gary Click of the Florida Department of Children and Families testified that some food stamp recipients sell their stamps for cash at fifty cents on the dollar.

[22]Click testified that although the food stamps had serial numbers, those numbers were not recorded upon issuance, and therefore the State could not tell which food stamps had been issued to any particular person.

point that there is evidence to support a robbery." The evidence linking Mansfield to the food stamps recovered in the computer room and linking those stamps to the ones Robles had when she was killed is much less convincing than the evidence linking Alvord to Ann Herrman's lighter, rings, and watch.

The *Mansfield I* Court also noted that the State's medical examiner testified that a pattern injury on Robles' neck "match[ed] the distinctive pattern found on the ring recovered from Mansfield during his arrest." Again, this overstates the case. The medical examiner testified that one portion of Mansfield's ring was consistent with one of the abrasions found on Robles' neck. But the record shows that the marks on Robles' neck were not so pronounced or distinctive as to provided much certainty that they had been caused by Mansfield's ring. When asked whether she could be sure that the ring caused that injury, the medical examiner responded, "All I'm saying is that the ring could have done the injury on the neck." The medical examiner also testified that she and her staff thought that the injury might have been caused by a belt buckle. In *Alvord*, police searching the defendant's apartment found similarly ambiguous evidence – a short piece of rope "of the same type" used to strangle the victims. *Alvord II* at 601. There is no indication in the Alvord opinions as to how unusual the type of rope was (or, in other words, how unlikely it was that the defendant's possession of the same type of rope used to commit the murders was a mere coincidence).

Thus the situation in the instant case bears a superficial similarity to the situation in *Alvord*. Both cases involved testimony that the defendant had confessed to the crime, and physical evidence tending to link the defendant to the victims' property (the food stamps, the jewelry) or the defendant's property (the ring, the rope) to the victims' deaths. There, the similarity ends. By

-57-

any reasonable assessment, the girlfriend's testimony about Alvord's confession had far more evidentiary weight than Randall's testimony about Mansfield's jailhouse confession, and the testimony linking Alvord to particular pieces of jewelry owned by the victim was much more damning than the testimony showing that Robles had food stamps when she died and that some food stamps were found in the room where Mansfield slept. (The evidence regarding Mansfield's ring and Alvord's rope was roughly equivalent, but not particularly convincing in either case.)

The difference between the two cases is even more pronounced when one considers a topic that the Florida Supreme Court apparently never broached: the evidentiary weight of the improperly admitted statements made by Alvord and Mansfield. In *Alvord*, while being questioned about an unrelated burglary several weeks after the deaths of the Herrmans and Georgia Tully, the defendant responded, "I am a rapist, not a God-damn thief." *Alvord v. State*, 322 So. 2d 533, 537 (Fla. 1975). There was evidence suggesting that Lynn Herrman had been raped before her death, and Alvord's statement was admitted into evidence in his murder trial, despite the lack of a proper *Miranda* warning by the questioning detective.[23] *Id.* Thus, Alvord "admitted" that he was a rapist, but his out-of-the-blue, single-sentence revelation did not link him with any particularity to the murders for which he was on trial.

---

[23]Alvord made several other incriminating remarks during this interrogation, telling the detective he was wanted for three murders in Florida, and when asked if he committed the murders, responding, "They will have to prove it." *Id.* at 537. The *Alvord II* opinion suggests that these other statements were also admitted, but this appears to be an error, as the *Alvord I* opinion clearly states "Over objection of defendant, the statement 'I am a rapist, not a God-damn thief,'" was admitted into evidence. *Alvord I* at 537.

In the instant case, the erroneously admitted evidence consisted of two hours[24] of accusations by the police and unconvincing denials and contradictions by Mansfield. The defendant was accused of Robles' murder over and over and over again, and responded by contradicting himself as to whether he left the bar with Robles, and then repeatedly being unable to muster a persuasive defense because he didn't remember anything during the pertinent time frame. Alvord's one-sentence statement did not bear directly on the issue of his guilt the way that Mansfield's two hours of contradictions and unconvincing denials did. Even if all of the properly admitted evidence in the two cases had been roughly equivalent, the videotape in Mansfield's case was likely to have a much more substantial impact on a jury than the single sentence uttered by Alvord. And, as noted above, the properly admitted evidence in Alvord's case was much more compelling than the properly admitted evidence against Mansfield.

Given these significant distinctions between two superficially similar cases, the *Mansfield I* court erred when it relied on a comparison to *Alvord* to conclude that the videotaped interrogation, beyond a reasonable doubt, did not affect the jury's verdict. And the Court finds that this error resulted from an objectively unreasonable application of *Chapman*. The *Mansfield I* court reached its conclusion by comparing the properly admitted evidence in the case before it to the properly admitted evidence in the Alvord case. But that is only part of the equation. Logically, the impact of one piece of evidence on the jury and its verdict depends on both the strength of the other evidence in the case *and* the strength of the particular piece of evidence at issue. Before determining the impact of the videotape, the court also needed to compare it to Alvord's statement,

---

[24]The actual running time of the videotape is closer to two and a half hours, but Mansfield is alone in the interrogation room for about forty minutes during that span.

and it did not do so. Without this information, the comparison between *Alvord* and *Mansfield* was essentially meaningless. And the *Mansfield I* court made no other effort to assess the impact of the videotape on the particular jury in this case – no assessment of the amount of time the videotape was discussed during this trial, for example.

8.    *Analysis – Brecht*

Having determined that the *Mansfield I* decision involved an unreasonable application of clearly established federal law, the Court is required to perform its own assessment of the harmlessness of the videotape under the *Brecht* standard. The Florida Supreme Court "considered the admissibility of the tape to be harmless error because of the fact that the tape was not the centerpiece of the state's case against Mansfield." *Mansfield II* at 1180 (citing *Mansfield I* at 645). Obviously, a piece of evidence does not have to be the "centerpiece" of the prosecution's case to have *some* impact on the verdict. And in this instance, the Court has little doubt that the videotape had a substantial and injurious effect on the jury's verdict.

At numerous points on the videotape, Mansfield makes statements that suggest he is lying to the police. This is most pronounced at the outset of the interrogation, when Mansfield repeatedly and emphatically denies that he left the bar with Robles and Finneran. Mansfield states that Robles and Finneran headed off in one direction while he headed off in the other, and that he went straight home. Mansfield goes on to state that he is "positive" about this and that he knew that he went straight home because he was in no condition to do anything else. At trial, this assertion was contradicted by at least five witnesses who saw Mansfield, Robles and Finneran (or people matching their description) together after Rosie's closed.

There were numerous other instances in which Mansfield damaged his credibility in the eyes of anyone watching this tape. Shortly after Mansfield's repeated assertions that he went straight home, one of the detectives suggests that there is a videotape that contradicts him: "Suppose I told you [supermarkets] have cameras and they record who's going in and going out and suppose I said that you were in Winn Dixie last night?" Mansfield then changes his story, stating that he "might have stopped and got a pack of smokes" at the Winn-Dixie where Robles' body was found, although he didn't remember doing so.[25] When asked about some apparently fresh scratches on his face, Mansfield said he got them all at work, then appeared to get caught in a lie about when he last worked:

| | |
|---|---|
| Det. Shepard: | Did you work yesterday? |
| Mansfield: | I went over there. |
| Det. Shepard: | But you didn't work because your finger's messed up. |
| Mansfield: | I still worked. |
| Det. Shepard: | That's not what your brother told us. |
| Mansfield: | I didn't go to work yesterday, no. |

(App. A54 at 13).

The videotape also provided a forum for the police to repeatedly accuse Mansfield of murdering Robles, to suggest he must be a "sicko," and to assert that "something must have set you off." Mansfield repeatedly denied the accusations, but stated that he did not recall anything between the time he left the bar and the time he went swimming in the apartment complex pool to

---

[25]No evidence of any such videotape was introduced at trial. The only cashier working at the Winn-Dixie that night testified that she did not recall selling cigarettes or anything else to Mansfield.

sober up. It is not unlikely that these repeated allegations, combined with Mansfield's failure to convincingly deny them, helped convince the jury that Mansfield had, indeed, committed murder. This conclusion is reinforced by the fact that during the interrogation, the police repeatedly announced that the case against Mansfield was strong, saying such things as that there was "quite a bit of evidence" against him. The police also bolstered the testimony of the people who contradicted Mansfield's statements during the interrogation (and who would eventually testify against him at the trial), stating that they had nothing to gain by telling the police things that were at odds with Mansfield's statements, or that they had good memories.

The police on several occasions described evidence that, so far as the record shows, did not actually exist. In addition to the alleged Winn-Dixie surveillance videotape, the police at one point suggested that one of Mansfield's hairs was found on Robles in an intimate place:

Det. Schroeder:   You didn't have no sex with her?

Mansfield:   No.

Det. Shepard:   So no hairs or anything like that on her? There's a lot of ways to find out.

Mansfield:   I know there's a lot of ways to find out.

Det. Schroeder:   Think real hard about it.

Mansfield:   If any hair got on her, it might have been at the bar.

Det. Shepard:   That's not where we found them either. Not where we found them.

Mansfield:   I didn't have sex with her. I didn't have sex with her.

Det. Shepard:   No one said you had sex with her. Just asked you if you did. We had hairs and we know where they are. And you didn't talk to this person and the hair fall out where we found it at, okay?

-62-

No evidence of any such hair was introduced at trial.

Because the videotape is so lengthy and covers so much ground, it is not simple to assess its impact in the context of the entire trial. This is not a case, like *Alvord*, where the erroneously admitted statement tied the defendant to one facet of the crime. Rather, the effect of the videotape here, though less obvious, was ultimately more damaging. Indeed, the State certainly seemed to think that the jury needed to carefully consider the videotape in reaching its verdict, given that it referred to the videotape several times during its opening statement.[26]

The strongest part of the case against Mansfield was likely the evidence that he was with the victim at the Winn-Dixie just before she died, and that his pager was found near where her body was found. But the case was not overwhelming.[27] There was no DNA or blood evidence from Mansfield on Robles' body or vice versa. Finneran also was in Robles' company until just a few minutes before her death, and his alibi was weak, with sufficient gaps and uncertainty to preclude ruling him out as a suspect. And the State was not able to produce a convincing motive for Mansfield to murder Robles. There was no evidence of a history of ill will between the pair, who apparently had met only once before, under friendly circumstances. The witnesses who saw them together the night of Robles' death all stated the pair were on good terms. The State argued that Mansfield killed Robles as part of a robbery, but the sadistic mutilation of Robles' body seems

---

[26]The State offered no closing argument in this case.

[27]On the morning of the first day of the trial, with the trial judge having already ruled that the videotape would come in, the State offered to let Mansfield plead to second degree murder, which would have carried a penalty of twenty years to life imprisonment.

inconsistent with a simple robbery. In addition, the evidence suggests that Robles had only food stamps and that Mansfield knew this, making her an unlikely target for him to rob.

But putting the videotape in evidence allowed the prosecution to show Mansfield being evasive and contradicting himself while being accused of committing this ghastly murder, and of making statements that were contradicted by numerous other (apparently trustworthy) witnesses who testified at the trial. Thus, no matter who else might have been with Robles around the time of her death, and whatever his motive might have been, and whatever weaknesses might be present in the State's case, it appeared that Mansfield was lying when he denied murdering Robles. Given this effect, and given the questionable aspects of the interrogation – the bolstering of the testimony of the other witnesses against Mansfield, and the references to non-existent evidence – it is extremely unlikely that this videotape played no part (or only a minimal part) in the jury's deliberations or its verdict. The Court is therefore unable to conclude, under *Brecht*, that the introduction of the videotape was harmless error.

## C.    Claim Fifteen - Cumulative Error

The Eleventh Circuit Court of Appeals has recognized that in reviewing a habeas petition, "[a] piecemeal review of each incident does not end our inquiry. We must consider the cumulative effect of these incidents and determine whether, viewing the trial as a whole, appellants received a fair trial as is their due under our Constitution." *United States v. Blasco*, 702 F.2d 1315, 1329 (11th Cir.1983) (citing *United States v. Labarbera*, 581 F.2d 107 (5th Cir.1978)).

Apart from Petitioner's *Miranda* claim, after an exhaustive review of the guilt and penalty phase proceedings, this Court cannot say that Petitioner's "trial, as a whole, was fundamentally unfair and outside of the bounds of the Constitution." *Conklin v. Schofield*, No. 02-15674 D.C.

Docket No. 95-00914-CV-A-JEC, 2004 WL 840614 (11th Cir. April 21, 2004) (rejecting petitioner's "cumulative effects" claim, and affirming the denial of federal habeas relief). Accordingly, this claim is denied.

## VII.    CONCLUSION

More than 40 years ago, the United States Supreme Court recognized that custodial police interrogations are inherently coercive and exact "a heavy toll on individual liberty."[28] Their use runs the risk of compelling Americans to incriminate themselves, violating our rights under the Fifth Amendment. To combat this risk, the Court set guidelines for the police and the courts, permitting statements made during custodial interrogations to be admitted at trial only where the police had notified the suspect of his right to remain silent, to have an attorney, and all the rest.

*Miranda* has been the law of the land for more than 40 years. The warnings it requires are well-known to schoolchildren – let alone commissioned police officers – and its purpose of safeguarding our right to be free from compelled self-incrimination remains as viable today as it was when the decision was handed down in 1966. Its violation here was blatant and obviously prejudicial to the Petitioner. Accordingly, habeas relief will be granted with respect to Claim One.

Claims Two through Fifteen are without merit and will therefore be denied. None of the claims raised in the Petition requires an evidentiary hearing. Any of Petitioner's allegations or claims not specifically addressed herein have been found to be without merit.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

---

[28]*Dickerson v. United States*, 530 U.S. 428, 435 (2000) (Rehnquist, C.J., analyzing *Miranda*)

1. The Petition for Writ of Habeas Corpus filed by Scott Mansfield (Doc. No. 1) is **GRANTED** in part and **DENIED** in part.

2. The Court has determined that Claims Two through Fifteen are without merit and that habeas relief with respect to these claims is **DENIED** with prejudice.

3. The Writ of Habeas Corpus shall issue on Claim One, and the prisoner, Scott Mansfield, shall be released unless the State of Florida conducts a new trial within **ONE HUNDRED-TWENTY (120) days** from the date of this Order.

4. The effect of this Order will be automatically stayed pending resolution of any appeal taken to the Eleventh Circuit Court of Appeals.

5. The Clerk of the Court is directed to enter judgment and close the case.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on February 25th, 2009.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

pslc 2/26
Counsel of Record
Unrepresented Party